Beth PEDERSON, et al.

v.

LOUISIANA STATE UNIVERSITY, et al.

No. CV94–247–A–MI.

United States District Court,
M.D. Louisiana,
Baton Rouge Division.

Jan. 12, 1996.

894

Keith B. Nordyke, Nordyke & Denlinger, Baton Rouge, LA, Thomas L. Krebs, Ritchie & Rediker, P.C., Birmingham, AL, R. Lawrence Ashe, Jr., Nancy E. Ryan, Lynne H. Rambo, Paul, Hastings, Janofsky & Walker, Atlanta, GA, for plaintiff.

Gerald Michael Pharis, William Shelby McKenzie, David Mark Bienvenu, Jr., Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for defendant.

## OPINION

DOHERTY, District Judge.

### PROCEDURAL HISTORY

Plaintiffs' initial complaint entitled "Complaint—Class Action" was filed in the Middle District of Louisiana on March 31, 1994, by Beth Pederson, Lisa Ollar and Samantha Clark, hereinafter referred to as ("Pederson" or "*Pederson* plaintiffs"), each individually and "on behalf of all others similarly situated," seeking "declaratory, injunctive and monetary relief" against Louisiana State University, William E. Davis, individually and in his official capacity as Chancellor of Louisiana State University, Joe Dean, individually and in his official capacity as Athletic Director of Louisiana State University, Elaine D. Abell, Clarence L. Barney, Milton C. Chapman, Elenora A. Cawthon, David Conroy, Charles V. Cusimano, Gordon E. Dore, Janice M. Foster, Jimmy A. Lalonde, Jr., Joseph Lesage, Jr., Rolfe McCollister, Jr., Roger H. Ogden, Nicholas Smith, Jr., Joseph L. Waitz, Charles S. Weems, III, John R. Williams, Milton J. Womack, each in their official capacity as members of the Board of Supervisors ("LSU"). The equitable relief requested in the complaint included an affirmative injunction by this Court ordering LSU to field an intercollegiate varsity women's fast pitch softball team in 1995 and a intercollegiate varsity women's soccer team in 1994. As the basis for their claim, plaintiffs specifically alleged interest and skill in soccer; however, none of the three asserted interest or ability in fast pitch softball or any other sport. Defendants answered on May 16, 1994, denying plaintiffs' allegations and contesting plaintiffs' standing to assert an action or class action requesting remedy as to women's fast pitch softball.

On May 16, 1994, plaintiffs filed a Motion for Preliminary Injunction, a Motion for Class Certification, and requested expedited hearing. The Motion for Preliminary Injunction sought to compel LSU to institute intercollegiate varsity soccer in the Fall of 1994 and intercollegiate varsity fast pitch softball in the Fall of 1995. Judge Parker, then presiding, denied plaintiffs' request for expedited hearing on May 20, 1994 and both motions were scheduled for hearing on June 17, 1994 in the Middle District of Louisiana. Thereafter, Judges Parker and Polozola, the two sitting judges of the Middle District, recused and the case was referred to Judge Politz, the Chief Judge of the Fifth Circuit, for reassignment. On June 28, 1994, the suit was reassigned to Judge Rebecca F. Doherty of the Western District; however, the case remains filed within the Middle District of Louisiana. This Court responded to plaintiffs' request for "expeditious" hearing on the Preliminary Injunction and class certification by holding a telephone status conference with all counsel on June 29, 1994. As a result of those discussions, the hearing for Preliminary Injunction was set for July 28 and 29, 1994 and a scheduling order was issued. During the telephone conference, both parties agreed to a bifurcated trial; damages to be tried separately from the case on the merits.[1]

On September 19, 1994, defendants filed a Motion for Summary Judgment, urging the dismissal of plaintiffs' Motion for Preliminary Injunction alleging plaintiffs lacked standing to seek the requested mandatory Preliminary

---

1. Counsel for plaintiffs and defendants made additional filings which prompted a telephone status conference on July 1, 1994, wherein it was determined plaintiffs' claim was much broader than previously disclosed and, accordingly, the hearing for Preliminary Injunction was reset tentatively for August 15, 1994 with a backup date as a preferential fixing for October 17, 1994. The request for class certification was fixed for hearing on November 15, 1994.

Injunction affecting fast pitch softball.[2] Defendants argued none of the named plaintiffs had desire to participate in fast pitch softball, and therefore, LSU's actions concerning fast pitch softball had no impact on those plaintiffs and accordingly plaintiffs lacked standing to ask this Court to force LSU to change its decisions concerning fast pitch softball.

After receipt of numerous memoranda both in support of and in opposition to defendants' Motion for Summary Judgment, on October 11, 1994[3] via telephone conference, this Court issued a preliminary ruling as to defendants' motion indicating its intent to grant defendants' motion on different grounds and to deny plaintiffs' request for Preliminary Injunction ordering LSU to act upon fast pitch softball.[4] Formal written reasons were issued on October 28, 1994 dismissing plaintiffs' Motion for Preliminary Injunction.[5]

After denial of the *Pederson* preliminary injunction, Cindy and Karla Pineda sought to introduce their claims into the *Pederson* suit via an "intervention of right." This Court denied the request to intervene as procedurally improper as it contained new, distinct and expanded claims from those made by Pederson and invited plaintiffs' counsel to properly join the Pinedas and their new claims as party plaintiffs in the *Pederson* suit.[6] Plaintiffs did not do so.

At a December 1, 1994 status conference,[7] the *Pederson* plaintiffs informed the Court that their Motion for Class Certification was couched under only Federal Rules of Civil Procedure 23(b)(2), seeking certification of an injunctive class. Monetary damages were sought only by the named plaintiffs individually; plaintiffs did not seek certification of a class pursuant to Federal Rule of Civil Procedure 23(b)(3) or monetary damages for the class.[8]

At the December 1, 1994 conference the Court bifurcated the trial into Stage One on the equitable relief sought by plaintiffs and Stage Two on the issue of monetary damages. Stage One was set for October 10 through 27, 1995 involving those issues within the request for declaratory and/or injunctive relief as to the named plaintiffs and any class that might be certified by the Court.[9] Stage Two would be heard after Stage One and would address the damage claims made

---

**2.** All counsel agreed to stipulate that plaintiffs' request for Preliminary Injunction as to instatement of women's soccer in the Fall of 1994 was moot; consequently, this Court dismissed same as moot. Further, the Court subsequently held a pre-trial conference on September 28, 1994 in anticipation of the hearing on the remaining issue as to the preliminary injunction and extensively discussed with counsel defendant's Motion for Summary Judgment based on standing and issued a new Scheduling Order for the Preliminary Injunction hearing and ordered the parties to comply with this Court's Pre–Trial Procedures Outline. The Court informed the parties that additional Scheduling Orders and dates would be given for the hearing on Class Certification scheduled for November 15, 1994 and for trial on the merits, once date was set.

**3.** Document # 79—Record of Telephone Status Conference.

**4.** Document # 88—Memorandum Ruling, October 28, 1994. However, the Court did not base its grant of defendants' Motion for Summary Judgment on the issue of standing, as argued by defendants, rather denial of plaintiffs' Motion for Preliminary Injunction was granted on the basis the relief requested by the plaintiffs, i.e. the insti-

tution of intercollegiate varsity softball in the Fall of 1995 rather than the Fall of 1996, was not relief that the Court would grant by way of Title IX.

**5.** Plaintiffs filed a Notice of Appeal with regard to the denial of Preliminary Injunction, which is presently pending before the Fifth Circuit Court of Appeals.

**6.** Document # 94—Memorandum Ruling, November 15, 1994.

**7.** Document # 107—Transcript of Status Conference held December 1, 1994.

The pre-trial conference for the hearing on class certification on December 1, 1994 was converted to a status conference, wherein the parties requested they submit the issue of class certification on briefs with supporting evidence, thus foregoing the evidentiary hearing.

**8.** Plaintiffs indicated they may wish later to seek such relief; however, the Court has not been advised of any such change in position.

**9.** Document # 112—On December 16, 1994 the Court issued a Scheduling Order for trial on Stage One beginning on October 10, 1995.

by the *Pederson* plaintiffs.[10]

On January 3, 1995 Cindy and Karla Pineda filed suit in the Eastern District of Louisiana, requesting declaratory and injunctive relief against LSU and, in particular, a preliminary injunction as to fast pitch softball. Defendants moved to transfer the case to the Middle District and to consolidate the *Pineda* suit with the pending *Pederson* suit. Plaintiffs opposed the transfer of the case to the Middle District and initially opposed the proposed consolidation with the *Pederson* suit.[11] Transfer was granted on February 22, 1995 and a Motion to Consolidate was presented to and signed by Judge Polozola on March 30, 1995.[12]

The Court ruled on July 5, 1995 [13] denying the Pinedas' request for a preliminary injunction requesting: (a) institution of intercollegiate varsity fast pitch softball in the Fall of 1995, (b) requesting LSU present a plan for compliance with Title IX, and (c) freezing current expenditures and administrative support for male varsity sports at Louisiana State University. Full written reasons for the denial are contained within this Court's October 28, 1994 ruling.

On September 14, 1995, this Court issued several rulings, one Memorandum Ruling delineating the claims which remained before the Court at that juncture.[14]

---

**10.** The Court also ruled, for reasons contained within the record, to limit plaintiffs' claims, as follows:

(1) The Court GRANTED defendants' Motion to Dismiss all individuals named as defendants to plaintiffs' Title IX claim, based on jurisprudence which limited a Title IX action to suit solely against the academic institution and did not allow suit against an individual. (This ruling was subsequently modified by this Court's ruling of September 14, 1995). *See* note 17.

(2) The Court further DISMISSED the 42 U.S.C. § 1983 claims for damages against the defendants named in their official capacities based on the Eleventh Amendment of the United States Constitution. (This ruling was subsequently modified by this Court's ruling of September 14, 1995). *See* note 17.

(3) The Court DENIED defendants' Motion to Dismiss plaintiffs' claims for damages on the basis that plaintiffs, as soccer players, lacked the requisite standing to pursue any claims related to the implementation decisions of LSU regarding women's fast-pitch softball; and

(4) The Court DEFERRED defendants' Motion to Dismiss the 42 U.S.C. § 1983 claims for damages made against William E. Davis and Joe Dean in their individual capacities on the basis of qualified immunity. (This ruling was subsequently modified by this Court's ruling of September 14, 1995). *See* note 17.

Document #107/108—Transcript/Minute Entry December 1, 1994 Status Conference.

**11.** Document #116—Minute Entry, January 17, 1995, concerning filing of *Pineda*. This Court issued a Minute Entry on January 17, 1995 indicating it would stay its ruling on class certification in *Pederson* pending disposition by the Eastern District of the Motion to Transfer in *Pineda*. Defendants requested a status conference; the Court indicated it would set a status conference in *Pederson* once the *Pineda* motion to transfer had been decided by the Eastern District.

**12.** Consequently, this Court ordered the parties to craft a modified scheduling order to address how the consolidation would effect the *Pederson* Scheduling Order. The parties submitted a complimentary copy of the proposed Joint Response to Consolidation and Addendum to the Scheduling Order directly to the Court in chambers, however the original was not provided to the Court for signing until May 25, 1995.

Paragraph 4 of the Addendum Scheduling Order states:

"The parties stipulate that the plaintiffs' Motion for Class Certification remains pending in the Pederson Action, and now applies to Cindy and Karla Pineda as well as the Pederson Action Plaintiffs. Plaintiffs will supplement the Motion for Class Certification, and the brief in support thereof, to the extent that the addition of the Pinedas as proposed class representatives has an effect thereon, within ten (10) days of approval and entry of this Joint Response to Consolidation and Addendum to Scheduling Order."

Paragraph 5 states:

"Defendants will respond to the supplemental class certification filing by Plaintiffs, and include therein their outstanding response to Plaintiffs' arguments that a class is needed, within two weeks after service of Plaintiffs' supplemental brief, or by May 12, 1995, whichever is later."

This Court received defendants' supplemental response on June 21, 1995.

**13.** Document #145—Memorandum Ruling Denying Pinedas' Motion for Preliminary Injunction regarding fast-pitch softball.

**14.** This Court ruled on September 14, 1995, via Memorandum Ruling and Amended Order of September 18, 1995, as follows:

(1) This Court granted plaintiffs' Motion to Reconsider its December 7, 1994 ruling dismissing Joe Dean and William Davis individually pursuant to Title IX and reinstated suit individ-

In a separate Memorandum Ruling, this Court provisionally certified the following class.

> Those female students enrolled at LSU since 1993 and any time thereafter who have sought or seek to participate in varsity intercollegiate athletics at LSU but who are or were not allowed such participation due to LSU's failure to field teams in said female varsity athletics.[15]

This Court provisionally certified the class, giving plaintiffs an opportunity to bolster their argument and evidence that sufficient numerosity existed. The Court further granted counsel for plaintiffs thirty days from the close of testimony in Stage One to submit the additional support of their claim as to the numerosity requirement.[16]

Stage One was tried before this Court beginning October 10, 1995, with closing arguments held on November 8, 1995. At trial, plaintiffs' remaining claims included individual plaintiffs and class claims for declaratory and/or injunctive relief against Joe Dean and William Davis individually and in their official capacities and the Louisiana State Board of Supervisors [17] based on the only remaining

---

ually against Joe Dean and William Davis pursuant to Title IX.

(2) This Court overruled its June 23, 1995 judgment denying defendants' Motion for Summary Judgment seeking to dismiss plaintiffs' claims pursuant to 42 U.S.C. § 1983 for monetary damages against Joe Dean and Williams Davis in their individual capacities. This Court converted defendants' Motion for Reconsideration of June 23, 1995 Denial of Summary Judgment to a Motion for Reconsideration of Qualified Immunity and granted same, dismissing plaintiffs' claims pursuant to Title IX against Dean and Davis individually for damages.

(3) The Court granted defendants' Motion to Dismiss plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 claims, finding they have been subsumed into plaintiffs' Title IX claim.

(4) The Court granted defendants' Motion for Partial Summary Judgment, dismissing the following.

(a) All claims of all plaintiffs for declaratory or injunctive relief with respect to the existing women's varsity sports of basketball, volleyball, track, tennis, golf, gymnastics and swimming;

(b) All other claims of all plaintiffs for declaratory and injunctive relief, *except:*

(i) Claims of Beth Pederson, Samantha Clark and Lisa Oller for declaratory judgment that defendants have violated Title IX by failing to accommodate plaintiffs' interests and abilities in varsity intercollegiate soccer, and, if such violation is found, the claims of Beth Pederson for injunctive relief to remedy such violation; and

(ii) The claims of Karla Pineda and Cindy Pineda for declaratory judgment that defendants have violated Title IX by failing to accommodate plaintiffs' interests and abilities in varsity inter-collegiate fast pitch softball, and, if such violation is found, the claims of Karla Pineda and Cindy Pineda for injunctive relief to remedy such violation.

15. Document # 197—Memorandum Ruling on class certification.

16. Document # 207—Memorandum of Pre-Trial Conference, September 14, 1995. Prior to decision on the merits, this Court denied plaintiffs' request for class certification. Full reasons are found in this Court's Memorandum Ruling dated January 11, 1996.

17. Document # 182—Transcript of December 1, 1994 conference.

Document # 175—Motion to Reconsider December 7, 1994 Ruling That Individuals Cannot be Sued Under Title IX.

Document # 199—Memorandum Ruling, September 14, 1995.

Document # 201—Memorandum Ruling, September 14, 1995.

Document # 206—Amended Order, September 18, 1995.

Plaintiffs initially sued Louisiana State University, William E. Davis, Chancellor of Louisiana State University, both individually and in his official capacity, Joe Dean, Athletic Director of Louisiana State University, both officially and in his individual capacity, and listed the then members of the Board of Supervisors of LSU and named them in their official capacity as members of the Louisiana State Board of Supervisors.

After an aggressive motion practice, this Court ultimately vacated and amended previous rulings as follows: (*See* note 10)

1. The Court dismissed plaintiffs 42 U.S.C. § 1983 claims, based on Fourteenth Amendment Equal Protection for declaratory, injunctive and monetary relief, against all parties in both their individual and official capacities, holding that said claims were more properly brought pursuant to Title IX. This Court had previously dismissed plaintiffs § 1983 claims for damages against defendants named in their official capacities based on the Eleventh Amendment of the United States Constitution. The Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C. § 2000d–7 abrogated the state's Eleventh Amendment immunity under Title IX.

issue: LSU's alleged failure to effectively accommodate its female students in violation of Title IX.[18] Plaintiffs asked for a variety of specific injunctive relief, the particulars of which continued to change up to and through the trial on the merits, and for a declaration that LSU was in violation of Title IX.

## FACTS

LSU has provided opportunity for its male students to participate in intercollegiate varsity athletics since the inception of football and men's baseball in 1893, and men's basketball in 1908.[19] Intercollegiate varsity athletic opportunity for its women athletes was provided in 1977 with the initiation of a women's sports program.[20] In 1979, women's fast pitch softball was added, but was dropped following the 1982–83 season with no credible reason given. No additional sports were added for either males or females until 1993 when the decision was made to add two intercollegiate varsity women's sports in the 1995 season, fast pitch softball and soccer.[21] Implementation of that decision was delayed

in accordance with an agreement of the Southeastern Conference schools and requests by the Senior Women's Administrators of the Southeastern Conference. The agreement called for commencing competitive conference play in soccer in the Fall of 1995 and to begin implementation of softball in the Fall of 1996 with competitive conference play in the Spring of 1997.

LSU hired a soccer coach, Miriam Hickey, in August of 1994 and began the process of obtaining facilities and athletes for play to begin in the Fall of 1995. Play at the intercollegiate varsity level began in 1995. LSU hired a softball coach, Cathy Compton, effective June 1, 1995 and began the process of recruiting athletes and obtaining a facility to initiate play in the Fall off-season of 1996 and intercollegiate competition in the spring of 1997. Play has not yet begun. Neither facilities nor recruiting for either the softball or soccer teams is complete.

A full complement of scholarships for both soccer and softball, *i.e.,* eleven each, have been allocated. However, presently only two

2. The Court granted plaintiffs' Motion to Reconsider its previous ruling that individuals could not be sued under Title IX (*See* note 10) and held that individuals exercising control could be sued individually pursuant to Title IX for damages effectively reinstating plaintiffs' Title IX claims against Joe Dean and William Davis, as requested by plaintiffs. The Court, however, subsequently dismissed plaintiffs' Title IX claims against Joe Dean and William Davis *individually for damages* holding that they were entitled to qualified immunity. Dean and Davis, however, remained in the suit individually and in their official capacities as to declaratory and injunctive relief under Title IX.

3. The order vacating this Court's December 7, 1994 ruling to allow suit against individuals pursuant to Title IX, also impacted the named Board of Supervisors, who had been dismissed in their official capacities under the order vacated. Accordingly, as this Court has not been petitioned to alter their status, they remain as named defendants under Title IX; however, the Louisiana State Board of Supervisors, itself, rather than the individuals who make up the Board is the proper party defendant with authority to respond to any declaratory or injunctive relief granted.

Consequently, defendants in Stage One of trial pursuant to plaintiffs' Title IX claims for declaratory and injunctive relief included Joe Dean and William Davis, both individually and in their official capacities and the LSU Board of Supervisors. Plaintiffs' Title IX claims against the Loui-

siana Board of Supervisors for monetary damages were to be heard, if necessary, in Stage Two of trial.

18. This Court ruled previously that plaintiffs had standing only to assert a claim for ineffective accommodation. This ruling was based on reasoning that plaintiffs who are not varsity athletes at Louisiana State University had no standing to raise what has been termed as the "treatment" issues, contained within 45 C.F.R. § 86.41(2–10). *See* Standing, *infra.*

19. Plaintiffs' Exhibit # 454—Football Media Guide; Plaintiffs' Exhibit # 480—Baseball Media Guide; and Plaintiffs' Exhibit # 467—Basketball Media Guide.

20. Plaintiffs' Exhibit # 558, Affidavit of Joe Dean dated June 30, 1994.

| | |
|---|---|
| Women's Volleyball | 1977 |
| Women's Gymnastics | 1977 |
| Women's Basketball | 1977 |
| Women's Tennis | 1977 |
| Women's Swimming & Diving | 1977 |
| Women's Golf | 1979 |
| Women's Track & Field | 1981 |
| Women's Softball | 1979 |

21. Men's wrestling and men's gymnastics were eliminated in the Spring and Summer of 1985. Plaintiffs' Exhibit 558—Affidavit of Joe Dean—June 30, 1994.

partial softball scholarships have been awarded to two potential team players. Also, less than the full complement of soccer scholarships has been awarded. How many scholarships to award, when to award them, and to whom the scholarships are awarded is within the discretion of the respective coaches.

Testimony by Assistant Athletic Director, Greg LaFleur, established that, as of 1993, LSU recognized there was sufficient interest and ability among women students on its campus for LSU to consider additional action by the Athletic Department.[22] Additional factual findings are made throughout this opinion and will not be repeated here.

### STANDING

■ Before this Court can address the merits of plaintiffs' claims, the Court must first visit plaintiffs' standing to bring their claims in view of the jurisdictional limitations imposed by Article III, Section 2 of the United States Constitution. Federal judicial power may be asserted only to resolve "cases and controversies." *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). *Allen* and subsequent rulings by the Supreme Court hold that "the core component of standing is an essential and unchanging part of the case or controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Without standing, plaintiffs' claims cannot go forward.[23]

### I. Law

■ In order to establish standing under Article III of the United States Constitution, a plaintiff must demonstrate:

[1] that [s]he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . .

[2] that the injury "fairly can be traced to the challenged action" and

[3] [that the injury] "is likely to be redressed by a favorable decision."

*Cramer v. Skinner,* 931 F.2d 1020, 1024 (5th Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). In making a determination under this framework, "a court should consider three prudential concerns:

1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue;

2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and

3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties."

*Cramer,* 931 F.2d at 1024–25 (citations omitted).

Standing was directly addressed in the recent United States Supreme Court decision of *United States v. Hays,* —— U.S. ——, ——, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995). The Court in that Voting Rights Act case dismissed the claims of the appellees, finding they lacked standing to raise the issue. The Court reiterated that "the federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' "[24]

■ It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized,

---

**22.** Although there was some testimony that this recognition occurred as early as 1991, for present purposes it is sufficient for this Court to note it occurred no later than 1993.

**23.** As noted above, plaintiffs have asserted claims individually as well as on behalf of a class.

Standing must be established as to the individual claims of putative class representatives. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).

**24.** *Hays,* —— U.S. at ——, 115 S.Ct. at 2435.

and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by favorable decision." ... In light of these principles, we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power.... "[I]t is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' ... 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.' "[25]

*Hays* was a Voting Rights Act case wherein the appellees did not live in the district that was the primary focus of the alleged racial gerrymandering. They did not otherwise demonstrate they personally had been subject to a racial classification. As such, the Court noted they lacked standing to raise their claim and rejected appellees' position that "anybody in the state has a claim."[26]

The Court required a demonstration of "individualized harm" before standing could be found and noted that unless evidence of such "individualized harm" were present the plaintiffs "would be asserting only a generalized grievance against governmental conduct of which he or she does not approve."[27] The *Hays* court noted that the appellees had pointed to no evidence tending to show that *they* had suffered injury. Although the appellees insisted they were challenging the underlying state act in its entirety and not the specific impact on the individual district in isolation, the Court found that to be "irrelevant."

> The fact that Act 1 *affects* all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean—even if Act 1 inflicts race-based injury on *some* Louisiana voters—that *every* Louisiana voter has standing to challenge Act 1 as a racial classification. Only those citizens able to allege injury "as a direct result of having *personally* been denied equal treatment," may bring such a challenge, and citizens who do so carry the burden of proving their standing, as well as their case on the merits.[28]

The Court clearly required *personal injury* on the part of the claimants.

Although the Court addressed standing in the context of a Voting Rights Act and Equal Protection challenge, the standing analysis enunciated by the Court is independent of the context and applies equally to the matter before this Court. Merely because LSU's decisions concerning athletics and its female population affects some LSU women students, does not mean all LSU women students have standing to bring a challenge to LSU's actions. Only those women able to allege injury "as a direct result of having *personally* been denied equal treatment, may bring such a challenge."

■ In order to establish standing under Article III, a plaintiff must allege and show that she *personally* suffered injury. *Cramer, supra.* If she cannot show personal injury, no Article III case or controversy exists and a Federal Court is powerless to hear that grievance. The individual injury requirement is not met by alleging "that injury has been suffered by other, unidentified members of the class to which [the plaintiff] belong[s] and which she purports to represent." *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). Accordingly, a named plaintiff in a class action who cannot establish the requisite case or controversy between herself and the defendants cannot seek relief for anyone ... *not for herself,* and not for any other member of the class. *O'Shea,* 414 U.S. at 494, 94 S.Ct. at 675.

■ In addition to the need for personalized injury, the standing doctrine limits the scope of claims which may be asserted. Although some plaintiffs have established a case or controversy between themselves and the defendant on the basis of denial of effec-

---

**25.** *Id.* (citations omitted).

**26.** *Id.* at ——, 115 S.Ct. at 2436.

**27.** *Id.*

**28.** *Id.* at ——, 115 S.Ct. at 2437.

tive accommodation, as this Court finds below, this does not grant plaintiffs a *carte blanche* to assert all other claims they might wish and for which they have suffered no "palpable injury." The Supreme Court, when discussing the relationship between standing and a class action, stated it is not enough that the conduct of which the plaintiff complains will injure *someone*.[29] The complaining party must also show that she is within that class of persons who will be concretely affected. *"Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which [s]he has not been subject."*[30]

■ Finally, the standing doctrine requires a finding that standing exists as a matter of fact, not merely upon allegation. Even where standing is determined to exist upon allegations, courts are required to ensure at trial that those allegations have sufficient merit to justify continued jurisdiction over the case. "And when a case is proceeded to final judgment after a trial, as this case has, 'those facts (if controverted) must be "supported adequately by the evidence adduced at trial" to avoid dismissal on standing grounds.' "[31]

## II. Analysis

As is discussed in detail *infra*, Title IX and its jurisprudence clearly distinguish between, on the one hand, claims for unequal treatment of athletes based on sex ["treatment claims"] and, on the other hand, claims for ineffective accommodation of demands of female and male athletes, *i.e.*, equality of *opportunity* to participate in athletics.

■ This Court has had great difficulty identifying and, it seems, plaintiffs articulat-

ing the injury which forms the basis for plaintiffs' cause of action. Rather, allegations of a generalized grievance as to the manner in which "women at LSU were treated" have tended to predominate both the filings and the arguments made by plaintiffs. Such generalized allegations do not grant the requisite connexity and personal injury required for standing. This Court must examine the relationship of each plaintiff to LSU's actions, as well as the allegations and factual basis for the allegations made by each plaintiff, to determine if the requisite personal injury and connexity exists. Within this analysis, two separate and legally distinct factual scenarios exist.

### A. Treatment

■ All five plaintiffs asserted a claim for unequal treatment of female varsity athletes, including unequal pay to coaches, lesser quality facilities, and other related grievances. An unequal treatment claim presupposes that the claimant was a varsity athlete who was treated unequally based upon her sex. The complaint fails to allege, however, that any plaintiff ever participated in any varsity sport at LSU. As plaintiffs have never participated in varsity athletics at LSU, they can never have suffered injury from any alleged discriminatory action by LSU in its treatment of female varsity athletes vis-a-vis male varsity athletes. Plaintiffs have not alleged any experience of the effect, impact or alleged injury resulting from any of the alleged discriminatory practices within LSU's existing women's varsity athletics.

Plaintiffs have personally suffered no injury or threatened injury due to LSU's alleged illegal treatment of its female varsity athletes and, as such, fail the initial prong of the standing inquiry as to their claims for illegal treatment of female varsity athletes.[32]

---

**29.** *O'Shea*, 414 U.S. at 494–495, 94 S.Ct. at 675–76 (citations omitted).

**30.** *Blum v. Yaretsky*, 457 U.S. 991, 999, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982) (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67, 92 S.Ct. 1965, 1968–69, 32 L.Ed.2d 627 (1972)) (emphasis added).

**31.** *Hays*, —— U.S. at ——, 115 S.Ct. at 2435 (citations omitted).

**32.** Although plaintiffs, from the inception of this suit, have sought relief, both declaratory and injunctive for what has been termed "factors 2–10," the treatment portions of Title IX, for LSU's alleged disparate treatment of its male and female varsity athletes, plaintiffs have never sought relief for any disparate treatment by LSU of its female and male athletes at a lower organizational level.

However, this Court notes evidence presented at trial pursuant to plaintiffs' effective accommo-

The injury plaintiffs allege, *i.e.,* their inability to participate at the intercollegiate varsity level in their chosen sport at LSU, is arguably the result of LSU's alleged *ineffective accommodation* of its female student population, not of LSU's *treatment of its female varsity athletes* vis-a-vis its male varsity athletes. Thus, plaintiffs' claims as to illegal treatment of LSU varsity female athletes fail the second prong of the standing analysis.

As noted above, a plaintiff who might have been subjected to injurious conduct of one kind does not possess the necessary stake in litigating conduct of another kind, although similar, to which she has not been subject.[33] Further, a favorable decision by this Court that LSU treats its female varsity athletes in an unequal manner as to its male varsity athletes would not address plaintiffs' alleged injury, *i.e.,* their inability to participate in intercollegiate varsity athletics at LSU. For this Court to order LSU to treat its intercollegiate varsity female athletes differently would not impact plaintiffs, as they are not varsity athletes nor have plaintiffs convinced this Court plaintiffs will, in fact, be intercollegiate varsity athletes at LSU. Thus, plaintiffs' claim on the treatment issues fails the third prong of the standing analysis.

The Supreme Court in *Warth v. Seldin, supra,* instructed that even when a plaintiff has suffered his own injury, he must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties. By previous ruling, this Court dismissed plaintiffs' claims of unequal treatment in violation of Title IX, thus limiting plaintiffs' claims for declaratory and injunctive relief to those claims that LSU had failed to effectively accommodate plaintiffs' interests and ability to participate. This ruling remains undisturbed.

## B. Accommodation

■ *One must keep in mind that LSU is not required by Title IX to provide any athletic opportunity for any of its stu-* *dents.* However, should LSU *choose* to provide athletic opportunities for certain of its students, it then must provide *equal athletic opportunity* for both sexes and *not exclude* either group from participation because of their sex. LSU has chosen to provide athletic opportunity for its male students. Consequently, LSU must provide equal athletic opportunity for the interests and abilities of its female students and cannot *exclude* its female students from *participation* because of their sex. One must never lose sight that the key concepts involved in this challenge are *exclusion from* participation and *equal* athletic *opportunity.* Exclusion, in this instance, requires the existence of an interest to participate and the existence of an ability to participate. Opportunity is the possibility of participation, not the guarantee of participation.

Plaintiffs have alleged LSU failed to accommodate its female athletes by providing greater athletic opportunity to its male students than female students at a time when sufficient interest and ability existed within its female population to justify increasing women's sports opportunity. Trial on the merits of this claim was had in October, 1995.

As noted above, this Court previously declined to grant the injunctive relief sought by the original named plaintiffs as to softball. The *Pederson* plaintiffs did not allege that they had interest and ability to participate in fast pitch softball. After consolidation of the *Pederson* and *Pineda* suits, this Court declined to dismiss the Pinedas' claim as to softball on the argued grounds of a lack of standing.

■ However, defendants continue to raise the question of standing. While defendants challenge plaintiffs' standing to seek particular remedies, this Court declines to address standing only in terms of the *remedy* requested. Standing will be determined as a question of whether plaintiffs have the requisite interest to bring a cause of action. The

---

dation claims established that LSU's female soccer club is and was treated in the same manner as LSU's male and coed soccer clubs. Three of the plaintiffs participated in LSU's club soccer

program. None of the plaintiffs participated in any other club sport at LSU.

33. *Blum,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) and cases cited therein.

right to bring a cause of action is distinct from the right to obtain a specific remedy. Plaintiffs argue LSU is in violation of Title IX and urge this Court to so declare. Plaintiffs also request specific injunctive relief including the accelerated institution of intercollegiate varsity fast pitch softball and soccer. Whether the plaintiffs have standing to bring their suit is not to be confused with the question of whether plaintiffs are entitled to the equitable relief they seek.

· In accordance with this Court's continuing duty to monitor its jurisdictional basis, the question of whether the *Pineda* and *Pederson* plaintiffs have proven the merits of their standing claims is herein addressed.

### i. Pinedas

At trial, Karla and Cindy Pineda were students at LSU and each had eligibility to participate in intercollegiate varsity athletics. They continue to seek to play intercollegiate varsity fast pitch softball and they meet the NCAA eligibility criteria. LSU does not presently field a intercollegiate varsity fast pitch softball team; although LSU has begun implementation of an intercollegiate fast pitch softball program by hiring Cathy Compton as its head softball coach effective July 1, 1995, the process is not complete. LSU asserts that Karla and Cindy Pineda will be given the opportunity to try out for the fast pitch softball team prior to its commencement of intercollegiate competition in the Fall of 1996 should such competition truly begin in the Fall of 1996.

The existence of one or two students with interest and ability to participate in sports likely would not constitute a basis for a claim of ineffective accommodation and thus, violation of Title IX. However, the Pinedas also established at trial the existence of sufficient interests and abilities on campus to field a intercollegiate varsity women's fast pitch softball team.

The *Pinedas* established that sufficient interest and ability existed on the LSU campus to field a successful Division I women's fast pitch softball team in 1979 and that interest and ability to participate in fast pitch softball has increased since 1979 nationally, regionally, locally and in the Louisiana high schools—the primary feeder schools for LSU. There-

fore, this Court finds interest and ability to participate in fast pitch softball has not declined since 1979 when there was sufficient interest and ability to field a successful Division I team. Yet, LSU provided and provides no opportunity of any kind for its female students to participate in fast pitch softball on any level.

The Pinedas have established they individually have the interest and ability to participate in athletics on some level at LSU; they have established sufficient interest and ability exists at LSU to field a Division I fast pitch softball team. The Pinedas have proved the University is providing greater opportunity to participate in sports for males than females and, in particular, LSU is providing opportunity to participate in varsity baseball for males with interest and ability similar to the Pinedas. Finally, plaintiffs have presented evidence that such action has caused them personal injury.

In short, the Pinedas have presented evidence sufficient to establish individualized injury and standing to bring a private right of action against LSU pursuant to Title IX.

Defendants argue that the Pinedas cannot make the cut to participate in fast pitch softball at the Division I level and therefore, they lack standing. This argument has no merit, for it presupposes that only those athletes who can prove they would get a position on a team have standing to claim they were discriminated against on the basis of their sex in being denied the *opportunity* to compete. Such an argument misconstrues the nature of both Standing and Title IX and grants control over standing to the subjective decisions of the university. Moreover, the question cannot be proven until the time team positions are actually offered: if determined to field a team in 1996, LSU should accept the best athletes available to it at that time. Whether the Pinedas are in that group depends, in part, upon the level of competition among the athletes who desire to get on the team and the subjective evaluations made by the university. Title IX's guarantee of equal opportunity is not granted only to the best athletes in the country; it is granted to all athletes who have an interest in partici-

pating in athletics as well as an ability to do so. The Pinedas have proven they have both. Whether LSU decides to eventually offer them positions on a team is not determinative of the issue.

LSU provided no organized athletic participation opportunity for those with the interest and skill of the Pinedas at any level, at a time when LSU provided greater athletic opportunity to its male than female students and at a time when male students with similar interest and skill were provided the opportunity to participate in baseball at the intercollegiate varsity Division I level.

### ii. *Pederson* Plaintiffs

As noted above, the *Pederson* plaintiffs, asserted claims that LSU was in violation of Title IX by ineffectively accommodating their interest in playing intercollegiate varsity soccer and requested particularized injunctive relief keyed to their particular sport of choice.

Samantha Clark and Lisa Ollar were ineligible to compete in intercollegiate athletics after May, 1995 under the regulations of the National Collegiate Athletic Association. As they became ineligible to compete during the course of the litigation, the particularized equitable relief requested vis-a-vis soccer no longer granted any remedy for Clark and Ollar. However, with respect to monetary damages, Ollar and Clark also argue LSU was in violation of Title IX during their period of athletic eligibility and that LSU's alleged violation produced individual personalized injury to them.

Ms. Pederson retains NCAA eligibility and was offered the opportunity to try out for the varsity soccer team in 1994, but was unable to do so because of knee surgery. She tried out in 1995, practiced with the team, was issued a uniform, and was included in the team picture. She never played with the team, rather, she quit due to financial problems and contemporaneously was cut as lacking the requisite skill.[34]

The evidence at trial established LSU has no male varsity Division I soccer team. Further, LSU provides the same opportunity for soccer participation for its male and female students—albeit limited support and opportunity—at the club level. Evidence established LSU has in no way excluded members of either sex from the opportunity to participate in soccer at the club level. Further, this Court finds the *Pederson* plaintiffs did not establish the existence of the requisite ability to play soccer above the club level. Consequently, the *Pederson* plaintiffs did not establish they had been *excluded* from athletic participation at LSU because of their sex; rather the evidence proved they were *included* in the soccer participation offered at LSU in the same manner as male students. Further, the evidence established the *Pederson* plaintiffs had not been, as alleged by plaintiffs, excluded from intercollegiate varsity play as none had the requisite skill to play soccer at the intercollegiate varsity level.

Although LSU provided greater athletic opportunity for its male than female students during this time, none of the *Pederson* plaintiffs alleged any interest or ability to participate in any sport other than soccer. All three participated in soccer at the club level—none had the requisite ability to participate above that level. Therefore, LSU's alleged violation of Title IX by not providing additional athletic opportunity to its female students in no way personally impacted these three plaintiffs. LSU's failure to provide greater opportunity could not have impacted the *Pederson* plaintiffs as they could not, and did not desire to, participate in other sports at LSU and could not have participated above the club level in soccer. Therefore, each lacks the requisite personal injury caused by the alleged violation of Title IX by LSU. Moreover, the particularized remedy sought as to soccer would not inure to Ollar's or Clark's benefit as neither is eligible under NCAA criteria to participate.

---

**34.** After hearing evidence at trial, this Court finds that Ms. Pederson was both cut from the team as she was unable to perform at the necessary threshold skill level at that time and contemporaneously chose to quit due to financial con- straints. However, notwithstanding her parallel decision to quit, ultimately, as of 1995 she could not perform at the necessary skill level to play varsity soccer at LSU.

As LSU's alleged violation of Title IX has not had the required *personal* impact on the *Pederson* plaintiffs, the *Pederson* plaintiffs do not have standing to bring claims for equitable or declaratory relief in this forum for violation of Title IX and as such their claims are DISMISSED WITH PREJUDICE.

## TITLE IX

### I. Law

In 1972 Congress enacted the prohibition against discrimination on the basis of sex by universities securing federal funds. Section 901(a) of Title IX of the Education Amendments of 1972 provides:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving capitol federal financial assistance . . .

20 U.S.C.A. § 1681(a) (1990).

After establishing that sex discrimination is prohibited, Title IX then proceeds to clarify that efforts to remedy historical sex discrimination shall not include preferential or disparate treatment of one sex over another, with one specific caveat: statistical evidence of disparate treatment may be considered in evaluating compliance with Title IX. Section 1681(a) shall *not* be

interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which makes this with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,*

That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C.A. § 1681(b).[35]

Section 844 of the Education Amendments of 1974, further provides that:

The secretary of [HEW] shall prepare and publish . . . proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.[36]

In 1975, the secretary of the Department of Health, Education and Welfare ("HEW") promulgated regulations to implement Title IX, which specifically encompassed college athletics (hereinafter referred to as "Regulations"). The Title IX Regulations were signed by President Ford on May 27, 1975 and submitted to Congress for review pursuant to § 431(d)(1) of the General Education Provisions Act ("GEPA"). After hearings, Congress did not disapprove the Regulations within the 45 days allowed under GEPA. The Regulations became effective on July 21, 1975, and were codified at 45 C.F.R. § 86, *et seq.*[37] The Regulations provided for a three-year transition period which expired on July 21, 1978.

Section 86.41 of the regulations which specifically addresses athletic programs in educational institutions receiving money from the federal government, defines the prohibition more completely than the stat-

---

**35.** For a detailed description of Title IX's history, statutory and regulatory framework, *see Cohen v. Brown University,* 991 F.2d 888 (1st Cir.1993).

**36.** 44 Fed.Reg. 71,413 (1979).

**37.** Initially promulgated by HEW, the regulations found in Title 45 of the Code of Federal Regulations are now designated as Department of Health & Human Services ("HHS") regula-

tions. In addition, three other agencies have promulgated substantially identical regulations concerning the prohibition of sex discrimination in athletic programs, specifically: the Department of Agriculture, 7 C.F.R. § 15a, *et seq.;* the Department of Energy, 10 C.F.R. § 1040, *et seq.;* and the Department of Education, 34 C.F.R. § 106, *et seq.*

ute, describes the circumstances under which separate teams will be allowed, grants educational institutions an adjustment period within which to come into compliance and, most important for purposes of this discussion, specifies that the prohibition against sex discrimination means federal aid recipients are required to provide equal athletic opportunity to members of both sexes.[38]

Determination of whether this latter requirement is being met shall be made, according to the regulation, by considering ten specific factors, as well as "other" factors. These factors include nine measures comparing how men's teams and women's teams are treated by the university—the so-called "treatment" issues.[39] The tenth factor identified in § 86.41 focuses the analysis on substantive equality of opportunity, i.e., "whether the selection of sports and

levels of competition effectively accommodate the interests and abilities of members of both sexes." 45 C.F.R. § 86.41(c)(1).

In 1979, HEW's Office of Civil Rights (hereinafter "OCR") added another layer to the administrative amalgamation. After notice and extensive comment, a "Policy Interpretation" became effective on December 11, 1979. The Policy Interpretation contains a more detailed measure of what OCR determined is required for equal athletic opportunity under Title IX.

According to the Policy Interpretation, Title IX can be violated in three ways:

(a) where the policies of an institution are discriminatory in language or effect; or

(b) where disparities of a substantial and unjustified nature exist in the benefits, treatments, services or opportunities af-

---

**38.** 45 C.F.R. § 86.41 reads as follows:

(a) **General.** No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) **Separate teams.** Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose of major activity of which involves bodily contact.

(c) **Equal opportunity.** A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
2) The provision of equipment and supplies;
3) Scheduling of games and practice time;
4) Travel and per-diem allowance;
5) Opportunity to receive coaching and academic tutoring;
6) Assignment and compensation of coaches and tutors;
7) Provision of locker rooms, practice and competitive facilities;
8) Provision of medical and training facilities and services;
9) Provision of housing and dining facilities and services;
10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Director may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

(d) **Adjustment period.** A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the elementary school level shall comply fully with this section as expeditiously as possible but in no event later than one year from the effective date of this regulation. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the secondary or post-secondary school level shall comply fully with this section as expeditiously as possible but in no event later than three years from the effective date of this regulation.

45 C.F.R. § 86.41 (1995).

**39.** Treatment issues are not implicated herein as no plaintiff has standing to assert same. *See* Standing discussion, *supra.*

forded male and female athletes in the institution's program as a whole; or

(c) where disparities exist in individual segments of the program with respect to benefits, treatments, services or opportunities which are substantial enough in and of themselves to deny equality of athletic opportunity.[40]

Additionally, the Policy Interpretation recognizes three areas in which compliance can be assessed: [41]

(a) Athletic Financial Assistance (Scholarships) [42];

(b) Equivalence in Other Athletic Benefits and opportunities (so-called "treatment" issues) [43]; and

(c) Effective Accommodation of Students' Interests and Abilities.[44]

The Policy Interpretation was effective on its face December 11, 1979. However, it was never approved by the President. The Policy Interpretation does not have the binding effect of those rules, regulations or orders authorized by 20 U.S.C. § 1682.[45]

Title IX, as previously interpreted, was dealt a significant blow when, in 1984, the Supreme Court in *Grove City College v. Bell,*

465 U.S. 555, 574, 104 S.Ct. 1211, 1221, 79 L.Ed.2d 516 (1984) held Title IX was "program specific," so that it applied only to those programs that were actually receiving federal funds. The Court reasoned that Title IX did not reach the entire university and, thus, did not reach an athletic program which did not, itself, receive federal assistance. Few athletic departments were impacted by Title IX, as interpreted by *Grove City College,* as few were the direct recipients of federal funds.[46]

Congress responded to the *Grove City College* decision by passing the Civil Rights Restoration Act of 1987, codified at 20 U.S.C. § 1987 (1988) ("Restoration Act"), wherein the institution-wide application of Title IX was clarified. The Restoration Act provided that if an educational institution received federal funds, the institution as a whole must comply with Title IX's provisions. There is little doubt that one of the primary reasons Congress passed the Restoration Act was to make it applicable to athletic departments.[47]

The judicial branch, by contrast with the executive, has had relatively little involvement with interpreting Title IX's statutory and regulatory provisions. At this point, nei-

**40.** 44 Fed.Reg. at 74,417–18.

**41.** *Id.* at 71,413.

**42.** *Id.* at 71,415.

**43.** *Id.* at 71,415–17. This section analyzes factors two—ten as set forth in 45 C.F.R. § 86.41(c)(2)–(10).

**44.** *Id.* at 71,417–18. This section deals with factor one as set forth in 45 C.F.R. § 86.41(c)(1).

**45.** Title IX, § 1682 authorizes the effectuation of the provisions of Title IX by "issuing rules, regulations or orders of general applicability which shall be consistent with the achievements of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Interestingly, § 1682 of Title IX also provides "no such rule, regulation or order shall become effective unless and until approved by the President." The Policy Interpretation effective December 11, 1979 was never submitted to the President for approval. Section 1682 of Title IX provides for administrative enforcement of the act by "each Federal Department and agency which is empowered to extend capital federal financial assistance to any education program or activity."

**46.** The LSU Athletic Department has never received federal financial assistance.

**47.** Continuing debate and controversy suggest that either Congress or OCR, or both, may revisit Title IX and its regulations. *See* Hearing on Title 9 of the Education Amendments of 1972, Before the Subcomm. On Postsecondary Education, Training, and Life–Long Learning of the House Comm. on Economic and Educational Opportunities, 104th Cong., 1st Sess. (May 9, 1995); Letter from 136 Members of Congress, House of Representatives, to Norma Cantu, Assistant Secretary for Civil Rights (June 30, 1995) (on file with the Committee on Economic and Educational Opportunities); Letter and attached Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test from Norma Cantu, Assistant Secretary for Civil Rights to Members of Congress, House of Representatives (Sept. 20, 1995) (on file with the Committee on Economic and Educational Opportunities); Letter from Buck McKeon and Steve Gunderson to Norma Cantu, Assistant Secretary for Civil Rights (October 30, 1995) (on file with the Committee on Economic and Educational Opportunities).

ther Court to whom this Court looks for binding guidance has yet addressed the issues under Title IX arising herein. The only case in which the Supreme Court has addressed Title IX since 1984 held that the statute does imply a private right of action.[48] The Fifth Circuit has addressed Title IX only in the context of determining that it does not create an avenue separate from Title VII for asserting employment discrimination claims.[49]

Within the broader scope of federal jurisprudence throughout the country, only a handful of cases have interpreted Title IX, and each of them is factually distinguishable from the case at hand.[50]

This Court has found precious little guidance within the available jurisprudence to aid in understanding the analytical framework within which to address the claims in this case. As noted above, this case involves female students at Louisiana State University who have never participated in varsity athletics and who want LSU to create varsity athletic opportunity for them.

In review, the present state of the law of Title IX includes a statute containing very broad language and few specifics, regulations issued by several different agencies, a Policy Interpretation adopted by OCR but never approved by the President or Congress, and very little jurisprudence, none of which clari-

fies the proper analysis of claims brought thereunder.

## II. Analysis

In the absence of binding jurisprudence or a standard of review provided within the statute, this Court must derive the proper analytical framework from the available sources. The statute itself contains a general prohibition against sex discrimination, which language does not further the analysis greatly. The regulations promulgated pursuant to 20 U.S.C. § 1681, *et seq.* do provide more guidance, with pertinent language mandating *equal athletic opportunity* for members of both sexes. More particularly, the regulations identify effective accommodation of interests and abilities of both sexes as the primary factor to be considered in evaluating whether an institution is granting equal opportunities to participate in athletics. The statute and the regulations, however, do not provide any additional aid in deriving an analytical framework under Title IX.

As noted above, OCR has also issued a Policy Interpretation. This interpretation is helpful in identifying issues which arise under Title IX and establishing an analytical framework for assessing claims arising under the Title. The Policy Interpretation has not been approved by either the President or Congress, however, and is also susceptible, in part, to an interpretation distinctly at odds

---

**48.** *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

**49.** *See Chance v. Rice University,* 984 F.2d 151, 153 (5th Cir.1993), reh'g denied with opinion, 989 F.2d 179 (5th Cir.1993); *Lakoski v. James,* 66 F.3d 751 (5th Cir.1995). In *Lakoski* the Fifth Circuit held that Title VII is the proper vehicle to bring an employment discrimination claim and that individuals seeking monetary damages for employment discrimination on the basis of sex in federally funded educational institutions may not assert Title IX either directly or derivatively through § 1983.

**50.** *Horner v. Kentucky High School Athletic Ass'n.,* 43 F.3d 265 (6th Cir.1994) (12 female student athletes who participated in interscholastic girls' high school slow pitch softball sued for failure to field fast pitch softball and failure to support equal athletic opportunity for females); *Kelley v. Board of Trustees,* 35 F.3d 265 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct.

938, 130 L.Ed.2d 883 (1995) (members of the men's swimming team alleged violation of Title IX when the university terminated the swimming program); *Favia v. Indiana University of Pennsylvania,* 7 F.3d 332 (3rd Cir.1993) (members of the women's gymnastics and field hockey teams alleged violation of Title IX when the university terminated both programs); *Roberts v. Colorado State Bd. of Agriculture,* 998 F.2d 824, *cert. denied,* — U.S. —, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993) (students and members of the women's fast pitch softball team alleged violation of Title IX when the university terminated the program); *Williams v. School District of Bethlehem,* 998 F.2d 168 (3d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994) (parents of a minor boy alleged violation of Title IX when he was excluded from a girls' field hockey team); *Cohen v. Brown University,* 991 F.2d 888 (1st Cir.1993) (members of the gymnastics and volleyball teams alleged violation of Title IX when teams were demoted from full varsity status to club varsity status; and *Cohen v. Brown University,* 879 F.Supp. 185 (D.R.I., 1995) (same).

with the statutory language. Despite these drawbacks, the Policy Interpretation definitely has a role to play in ascertaining the proper analysis of compliance with Title IX.[51]

The Policy Interpretation inquiry into **effective accommodation** keys to whether the (a) *selection of sports*[52] and (b) the *level of competition* including the *opportunity* for team competition effectively accommodate the (c) *interests and abilities*[53] of members of both sexes.[54] The selection of sports and determination of interests and abilities factors do not present difficulties in the analysis. It is the question of how to evaluate equality of opportunity in levels of competition which provides a significant sticking point in the Policy Interpretation's framework.

The OCR assesses whether males and females are allowed to compete at levels reflecting their interests and abilities by evaluating both the (a) opportunity for individuals of each sex to participate in intercollegiate competition ["opportunity"] and (b) for athletes of each sex to have competitive team schedules which equally reflect their abilities ["competition"].[55] The Policy Interpretation proceeds to provide standards for determining whether these two requirements are met.

First, as to the requirement that both sexes be allowed the "opportunity" to participate in accordance with their interests, compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where members of one sex have been and are under represented among intercollegiate athletics, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where members of one sex are underrepresented among intercollegiate athletes and the institution cannot show a

---

51. In *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), the court addressed the issue of whether time spent by company employees in the fire hall waiting for fire alarms was "working time" for purposes of the Fair Labor Standards Act. In determining what weight to give to the interpretation articulated by the Administrator of the Wage and Hour Division, the Court set forth the following standard:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

The *Skidmore* Court rejected the Administrator's interpretation as being erroneous.

52. Both plaintiffs and defendants assert they have no objection to the two women's sports now selected for addition by LSU. Consequently, the selection of women's fast-pitch softball and soccer over some other sport is not contested. One should note, under the analysis set out herein, that within the selection of sports, an institution is not required to provide exactly the same choice for males and females; however, where an institution sponsors a team for one sex, the institution may be required to allow the other sex to try out for the team or provide a team for the excluded sex.

53. In analyzing the *determination of the athletic interests and abilities*, the Policy Interpretation notes an institution may determine the interests and abilities by any non-discriminatory method of their choosing provided:

(a) The processes take into account nationally increasing levels of women's interests and abilities;

(b) The methods don't disadvantage the underrepresented sex;

(c) The methods take into account team performance records; and

(d) The methods are responsive to the expressed interests of students capable of intercollegiate competition who are the underrepresented sex.

44. Fed.Reg. at 71,417.

54. *Id.* Section 86.41 as interpreted in the Policy Interpretation also allows the OCR to look at other factors in this inquiry including the competitive opportunities provided in terms of the competitive team schedules available to both sexes.

55. *Id.* at 71,418.

continuing practice of program expansion. . . . whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.[56]

Assessment of compliance with the second goal, requiring equality of "competition" for each sex reflecting their abilities, focuses on the following:

(1) Whether the competitive schedules for men and women's teams on a program-wide basis affords proportionately similar numbers of male and female athletes equivalently advanced competition opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.[57]

■ In addressing the question of whether LSU effectively accommodated women's interest and ability to participate in sports by providing equal levels of competition for men and women, both plaintiffs and defendants argue, primarily, that the first prong of the "opportunity" factor and the first prong of the "competition" factor—both of which require the Department to assess proportionality between the sexes—should be acknowledged as a "safe harbor" or determinative of the overall issue, for educational institutions. In other words, plaintiffs and defendants desire this Court to find that, so long as males and females are represented in athletics in the same proportion as found in the general student population and are given numerically proportionate opportunity to participate in advanced competition, the university should be found to be in compliance with Title IX and, if numerical proportionality is not found, the institute should be found to be in viola-

tion of Title IX. This Court disagrees with either proposition and the analysis leading to such a result, and denies most emphatically so to hold.

In arguing that sufficient opportunity will be granted by achieving substantially similar numerical proportionality between the sexes among athletes as is found in the general student population, defendants rely upon specific language from jurisprudence which supports their position. This Court is not unaware of the *Roberts, Cohen* and *Horner*[58] holdings and, in fact, the explicit language within *Roberts* and *Cohen,* that one "may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup."[59] The Fifth Circuit has not spoken to this issue and this Court is not bound by *Roberts, Cohen* and *Horner.*

Further, this Court finds those decisions erroneous in this regard. To accept the interpretation in *Roberts, Cohen* and *Horner,* and the argument made by defendants, one *must assume* that interest and ability to participate in sports is equal as between all men and women on all campuses. For instance, if a university has 50% female students and 50% male students, the assumption, under this argument must follow that the same percentage of its male population as its female population has the ability to participate and the interest or desire to participate in sports at the same competitive level. A review of *Roberts, Cohen* and *Horner* finds no evidence to prove or disprove this assumption; nor has LSU or the plaintiffs in this case presented any evidence to support this assumption.

Without some basis for such a pivotal assumption, this Court is loathe to join others in creating the "safe harbor" or dispositive assumption for which defendants and plaintiffs argue. Rather, it seems much more logical that interest in participation and lev-

---

56. *Id.* These three factors have become known as the "three pronged analysis" or "safe harbor" and have become the subject of much discussion and confusion. They will be discussed fully in this opinion.

57. *Id.*

58. This Court also is aware of the *Kelley* opinion which indicates that prong one is a presumption and the institution has the burden of proof on prong two and three. *Kelley,* 35 F.3d at 271. This Court does not find *Kelley* correct, either.

59. *Cohen,* 991 F.2d at 898.

els of ability to participate as percentages of the male and female populations will vary from campus to campus and region to region and will change with time. To assume, and thereby mandate, an unsupported and static determination of interest and ability as the cornerstone of the analysis can lead to unjust results.

■■■ The *Cohen, Roberts* and *Horner* decisions, in defining equal numerical percentages or "proportionality" as a "safe harbor," strongly rely on each other and on a stated administrative deference. This Court is not unaware of the necessity to grant great deference to an administrative agency and in particular an administrative agency that was specifically required by Congress to promulgate interpretative regulations. However, the jurisprudential emphasis on numerical "proportionality" is *not found* within the statute or the regulations; rather, it is *inferred* from language in the Policy Interpretation and ignores other language within the Policy Interpretation and the statute which argues against such an inference.

■■■ Title IX does not mandate equal numbers of participants. Rather, it prohibits *exclusion* based on sex and requires *equal opportunity* to participate for both sexes. As appears in the Policy Interpretation, inherent in this prohibition and mandate is knowledge of the *desire to participate, the ability to participate* and *the level of competition involved.* Ceasing the inquiry at the point of numerical proportionality does not comport with the mandate of the statute.

Section 1681(a) of Title IX specifically provides the mandate of Title IX shall not be interpreted to require preferential or disparate treatment to members of one sex based on proportionality. Rather, those percentages should be considered as "tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex." Consequently, the clear language of the statute prohibits the interpretation of numerical proportionality argued by both defendants and plaintiffs. Therefore, to the extent that the Policy Interpretation operates to allow a "safe harbor" of numerical proportionality of competi-

tion, this Court rejects that reading as well as the concept of the "safe harbor." While the safe harbor concept has the virtue of being simplicity itself, this Court will *not* join in assuming that athletic directors in this country are incapable of meeting the burden of Title IX and its regulations which incorporates a knowledge regarding their student body, effective analysis of and meeting students' needs, and filling those needs in a non-discriminatory fashion. Rather, this Court finds the proper reading of the Policy Interpretation—and the proper analysis under effective accommodation—allows for consideration of all factors listed therein in determining whether the university has provided equal opportunity and levels of competition for males and females.

The Policy Interpretation, being crafted by an agency which has a great deal of knowledge and understanding of the particulars of assessing university athletics, provides a helpful guide to a thoughtful analysis of the mandate of Title IX. However, to the extent that the Policy Interpretation suggests by use of the disjunctive "or" that a mere reliance upon substantial numerical proportionality between the sexes suffices, it is contrary to the explicit language in 20 U.S.C. § 1681(b) and will not be followed herein. With this exception, the bulk of the analysis of compliance described in the Policy Interpretation will be adopted in this context.

### III. Application to the Instant Facts

■■■ The *Pineda* plaintiffs allege that LSU discriminated against them by not effectively accommodating their interest and ability to participate in intercollegiate varsity fast pitch softball. Under the statute, regulation, and Policy Interpretation, analysis of plaintiffs' claim proceeds as follows. In determining whether LSU has subjected its female students to discrimination based upon sex, this Court will look to whether its policies are discriminatory in language or effect, whether substantial and unjustified disparities exist within the program as a whole between opportunities afforded male and female students, or whether substantial disparities exist in individual segments between opportunities afforded male and female stu-

dents such as to deny equal athletic opportunity. This determination will be based upon an evaluation of whether LSU has effectively accommodated its students' interests and abilities.[60] As noted above, effective accommodation of interests and abilities requires the selection of sports appropriate to the student body's interests and that the level of competition reflect the ability of athletes available to participate.

Clearly, the pivotal element of the analysis in this case is the question of effective accommodation of interests and abilities. Of primary importance to the analysis is the requirement that LSU know what the interests and abilities of its female students are. Without that knowledge, neither LSU nor this Court can evaluate with true certainty whether LSU is effectively accommodating those interests and abilities in a sex-neutral way.

■ After hearing all the evidence presented, this Court finds LSU presented no credible evidence to establish what the interests and abilities of its student population are or have ever been. LSU has no method, discriminatory or otherwise, by which this determination can be made. LSU is and has been ignorant of the interests and abilities of its student population.[61]

Without any basis for determining whether LSU's athletics program is accommodating the actual interests and abilities found on campus, this Court is relegated to ruling on the question of discrimination based upon indirect evidence such as raw data regarding the student population and testimony of the athletic program's director and officers.

Plaintiffs established that LSU's student population during the relevant period was approximately 51% male and 49% female and LSU's athletic participation for the same period was approximately 71% male and 29% female.[62] Throughout the relevant period, LSU fielded a men's baseball team. Plaintiffs and LSU provided considerable evidence at trial that fast pitch softball, traditionally played by women, is the closest equivalent sport to baseball, traditionally played by men.

Plaintiffs established that sufficient interest and ability existed in 1979 for LSU to field a successful Division I varsity fast pitch softball team; in 1983 LSU disbanded that team and has not produced credible evidence of the reason for that decision. Plaintiffs established that interest and participation in fast pitch softball has not decreased since 1979; rather, it has increased nationally, regionally, locally and within the Louisiana high schools which act as primary feeders for LSU. Plaintiffs further established that, on the intercollegiate level, varsity fast pitch softball teams have increased in number since 1979. Therefore, this Court finds that the interest and ability within the LSU student population to participate in women's athletics—fast pitch softball, in particular—has not decreased since 1979 rather, should have increased.

Additionally, plaintiffs presented credible evidence that they have an interest in playing intercollegiate varsity fast pitch softball as well as substantial ability to play fast pitch softball.

---

**60.** The other two areas identified by the Policy Interpretation as posing the potential for discriminatory acts—awarding of scholarships and treatment of women's teams—are not at direct issue in this matter.

**61.** LSU could have obtained this information in a variety of ways, including, *but not limited* to:
 (1) Requests by students that a sport be added;
 (2) Requests that an existing club sport be elevated;
 (3) Participation levels in club or intramural sports;
 (4) Interviews with students, admitted students, coaches, administrators or others regarding interest in a particular sport;
 (5) Results of questionnaires of students and admitted students regarding interest in particular sports; and
 (6) Participation levels in interscholastic sports by admitted students.
 Information also could be obtained through discussions with amateur athletic associations or community sports leagues or, perhaps the simplest solution, the inclusion of a "participation and interest" question on the admissions form to the university. However, there was no testimony to support that any credible attempt was made to gather such information.

**62.** Document # 190—Pre-Trial Stipulations.

LSU presented some evidence that sufficient interest and ability to participate in fast pitch softball at the Division I intercollegiate varsity level is not now nor since 1993 has been found on the LSU campus. However, this Court did not find the evidence presented by LSU to be credible, rather found such interest and ability did exist on LSU's campus. Even were that the case, however, OCR specifically recognizes that compliance with Title IX can include competition on levels other than the intercollegiate level, *i.e.*, the club or intramural level.[63]

Plaintiffs established that intercollegiate play is provided for male students with similar interests and abilities by way of the varsity baseball team. The evidence is uncontroverted that, during the relevant time period, LSU provided absolutely no opportunities for women to compete in fast pitch softball at any level whatsoever.

By not fielding any women's fast pitch softball team for any level of competition, LSU has not been accommodating the interests and abilities of Plaintiffs individually and at least one segment of its female student athlete population. This finding, together with the large disproportionality between its male and female athlete populations compared to the general student body, and testimony presented by the LSU's Athletics Director[64], suggest that sex discrimination accounts for the discrepancies.

 Under the Policy Interpretation, an educational institution which is proved not to be effectively accommodating the interests and abilities of the underrepresented sex but is able to demonstrate a history and continuing practice of program expansion demonstrably responsive to the developing interests and abilities of the underrepresented sex may still be found to be in compliance with Title IX.[65] Assuming—without addressing the wisdom of allowing a university to avoid a finding of non-compliance when, as a matter

of fact, non-compliance has been proved—that this element of the analysis properly is incorporated herein, this Court finds that LSU has not provided credible evidence of such a history and practice. Quite the contrary, this Court finds that historically LSU has demonstrated a practice *not* to expand women's athletics at the university before it became absolutely necessary to do so.

Prior to the decisions made in 1993, no new women's teams had been added for 14 years. The last action LSU took to change the number of women's sports on its campus prior to 1993 was to eliminate a successful Division I intercollegiate fast pitch softball team, with no credible reason given for such a move.

LSU argues it has added two additional intercollegiate varsity women's sports, thereby demonstrating a history and pattern of expanding women's athletics. LSU's argument does not win the day. First, it has not yet added the two sports. In 1993, LSU made a verbal commitment to add a women's intercollegiate varsity fast pitch softball team and an intercollegiate varsity women's soccer team. However, this Court finds that LSU has not yet lived up to its verbal commitment. Softball is not yet in competition, nor is this Court convinced it will be in full and effective competition in 1996, as LSU claims; soccer is operating under considerable handicaps which handicaps demonstrate LSU's inadequate commitment to the team.

Secondly, this Court finds the evidence shows that LSU's decision to add two intercollegiate varsity women's sports was neither for the purpose of encouraging women's athletics, nor for responding to an increasing interest and ability in women's athletics on campus. In adding the two teams, LSU chose merely to follow the decisions made by the Southeastern Conference concerning whether to add additional women's teams, the time table for adding the new teams, and

---

**63.** It does not escape this Court's attention that 45 C.F.R. § 86.41(c) notes that a recipient which operates or sponsors *interscholastic, intercollegiate, club or intramural athletics* shall provide equal athletic opportunity for members of both sexes. The inquiry is not limited solely to varsity intercollegiate activity. (emphasis added)

**64.** *See* Intent discussion, *infra,* as well as findings throughout this opinion.

**65.** 44 Fed.Reg. at 71,418.

the actual institution of additional women's sports.

Not only did LSU fail to demonstrate a history and practice of expanding women's athletics on campus, but the plaintiffs proved that LSU's history and practice of not expanding women's teams extended beyond its own campus to the National Collegiate Athletic Association. Credible evidence was presented that LSU led a minority move to resist proposed changes toward gender equity in athletics within the NCAA. Despite the efforts of the minority group, the NCAA and the Southeastern Conference recognized the need for expansion of women's athletics, thus dragging LSU along with the tide of change.

Under the Policy Interpretation an educational institution which is proved not to be effectively accommodating the interests and abilities of the underrepresented sex but is able to demonstrate an adequate plan to redress its violations can nonetheless be found to be in compliance with Title IX.[66] Assuming—without addressing the wisdom of allowing a university to avoid a finding of non-compliance when, as a matter of fact, non-compliance has been proved—that this element of the analysis properly is incorporated herein, this Court finds that LSU has not provided credible evidence of the existence of an adequate plan. Full discussion of and reasons for this finding are found under separate heading.

For the foregoing reasons, this Court finds that LSU has not been accommodating the interests and abilities of its female student athletes. Moreover, LSU has not demonstrated a history and continuing practice of expanding athletic opportunities for its female student athletes nor an adequate plan to redress its violations. Based upon these findings and conclusions, this Court hereby DECLARES THAT LSU IS IN VIOLA-TION OF TITLE IX WITH RESPECT TO WOMEN'S ATHLETICS.

## IV. Remedy

In view of the finding that LSU is in violation of Title IX, the question then becomes: to what remedy is each plaintiff entitled? Plaintiffs have requested both monetary and equitable relief herein.

### A. Monetary Damages

The United States Supreme Court has specifically held that monetary damages are available under Title IX for intentional discrimination.[67] With regard to monetary damages for unintentional discrimination, however, neither the Supreme Court nor the Fifth Circuit Court of Appeals has specifically determined the question. Being without guidance from Congress or binding jurisprudence, this Court is left to infer the proper standard for granting monetary relief for proven violations under Title IX.

In 1983, the Supreme Court issued a decision in *Guardians Association v. Civil Service Commission of the City of New York.*[68] *Guardians* was a Title VI challenge to employment practices by the City of New York, an entity which receives funding from the federal government. Title VI prohibits race, color, and national origin discrimination by any program or activity receiving federal financial assistance.[69] The district court found discriminatory effect but no discriminatory intent in the employment practices under scrutiny. Several of the justices found that compensatory relief should not be granted for unintentional violations of Title VI.[70]

While *Guardians* is a Title VI case rather than a Title IX case, its analysis provides useful guidance because Title VI and Title IX are, themselves, very closely analogous. The similarities are obvious between Title VI, which prohibits race, color, and national origin discrimination by all recipients of federal

---

66. 44 Fed.Reg. at 71,418–19.

67. *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 75, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992).

68. 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

69. 42 U.S.C. § 2000d.

70. *Guardians,* 463 U.S. at 603–604, 103 S.Ct. at 3232–33.

funding, and Title IX, which prohibits sex discrimination by educational institutions and programs which receive federal funding. The Court in *Guardians* recognized these parallels.

Still later, in *Cannon v. University of Chicago* [441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)] (citation omitted) the Court, applying the factors specified in *Cort v. Ash* [422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)] (citation omitted) held that private parties could sue to enforce the prohibitions of Title IX ... against gender-based discrimination in any educational program supported by federal funds. A major part of the analysis was that Title IX had been derived from Title VI, that Congress understood that private remedies were available under Title VI, and that Congress intended similar remedies to be available under Title IX.[71]

One of the issues with which the *Guardians* Court struggled was the question of whether the relief available in private Title VI enforcement actions should be limited to declaratory and injunctive relief and what role intent plays in the cause of action and remedy under Title VI. Unfortunately, the Court was unable to fully resolve the question to a certainty. Indeed, the uncertainty was such that six opinions were filed in *Guardians*.[72]

■■■ Although *Guardians* cannot be said to have finally resolved the intent issue, this Court finds that the opinion provides guidance for the analysis of the question. When Congress enacts legislation pursuant to its Spending Power, placing compliance requirements on states and entities receiving federal funds, the Court will presume that Congress does not thereby intend to create a private right of action entitling citizens to recover monetary damages for non-compliance with the statutory requirements absent a showing that the non-compliance is intentional.[73] This presumption may be overcome by a clear declaration by Congress to the contrary.[74] Plaintiffs have neither suggested nor provided any evidence that Title IX was not enacted pursuant to the Spending Power. Plaintiffs have not presented argument to this Court that Congress intended to overcome the *Pennhurst* presumption, nor has this Court discovered evidence in its own research to suggest such a congressional intent. Therefore, in line with *Pennhurst* and the *Guardians* result, this Court finds that monetary damages are not recoverable under Title IX absent a finding of intentional discrimination.

■■■ LSU is in violation of Title IX for failure effectively to accommodate the interests and abilities of its female students to participate in athletics. Based upon the testimony of LSU's Athletics Director and others familiar with the management of athletics at the university, and although the question is a very close one, this Court holds that the violations are not intentional. Rather, they are a result of arrogant ignorance, confusion regarding the practical requirements of the law, and a remarkably outdated view of women and athletics which created the byproduct of resistance to change.

---

71. *Id.* at 594, 103 S.Ct. at 3228.

72. Justice White announced the judgment of the Court and announced the opinion in Parts I, III, IV, and V of which Justice Rehnquist joined. Justice Powell concurred in the judgment and filed an opinion in which Chief Justice Berger joined and in part of which Justice Rehnquist joined. Justice Rehnquist filed an opinion concurring in the judgment. Justice O'Connor filed an opinion concurring in the judgment. Justice Marshall dissented and filed an opinion. Justice Stevens dissented and filed an opinion in which Justice Brennan and Justice Blackman joined.

The Court clearly was divided on the question. The division and resulting ambiguity of the decision is highlighted by fn. 27 of the primary opinion and the concurring opinions of Justices Powell and O'Connor and their discussion of the Court's action in *Regents of the University of California v. Bakke,* 438 U.S. 265, 412–418, 98 S.Ct. 2733, 2810–2813, 57 L.Ed.2d 750 (1978).

The clear division of the Court on these issues create question as to the breadth of the actual holding of the Court in *Guardians,* on the question of intent.

73. *See Guardians,* 463 U.S. at 599, 103 S.Ct. at 3231 (1983); *Pennhurst State School v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

74. *Guardians,* 463 U.S. at 599, 103 S.Ct. at 3231.

LSU's ignorance about the state of compliance with Title IX was ably demonstrated at trial. The evidence is clear that LSU has no idea, whatsoever, what interests and abilities in athletics are to be found in its student body. Furthermore, the evidence also is absolutely clear that there is a marked disparity between the gender divide in the student population and that in the athletic population. Despite the fact that these two rather significant indicators could be interpreted to suggest that there might be a problem, Athletic Director Dean testified that he believed and continues to believe his "women's athletics" program to be "wonderful." In fact, he believed his program to be so wonderful that he invited an investigator from the Department of Education's Office of Civil Rights to visit LSU to evaluate the athletics program's compliance with Title IX. Ms. Bonnette's findings [75] confirmed Dean's ignorance of the actual state of compliance with Title IX by his athletic program.

Dean's testimony regarding his opinion that the women's athletics program is "wonderful" is credible. This Court accepts that Dean believes his program is wonderful, otherwise he would not have invited OCR to LSU to assess the program. When one is intentionally breaking the law, one does not invite those who enforce that law to come and look over your shoulder. Dean's opinion seems to have its source in the fact that LSU's women's teams fielded during the relevant time frame performed well in competition. This one-dimensional assessment of the athletics program, in this Court's opinion, created an arrogance on the part of the athletics management which has been—and continues to be—undaunted by the facts which suggest otherwise. However, LSU's arrogant ignorance, resulting in a violation of the law, does not amount to intentional discrimination. LSU is saved from the conclusion that it intended to discriminate in part by the fact that the jurisprudence and regulations regarding Title IX have been confused and unclear from the very beginning and Dean's contradictory actions.

As noted above, Title IX was enacted in 1972. Regulations were not promulgated until 1975. The Policy Interpretation, which explicitly recognized that universities were having grave difficulty evaluating whether they were in compliance with the law, was issued in 1979. The Supreme Court ruled, in 1984, that the law did not apply to specific programs, but only to entire university systems. Congress did not revise the law in response to the Supreme Court's holding until 1988. There have been remarkably few cases interpreting Title IX since that time, and many of them contain language and analyses antithetical to the statutory language, making their guidance highly suspect. Thus, confusion has reigned in the Title IX arena, giving universities reluctant to comply a great excuse for failing to do so.

As found hereinabove, LSU has clearly been one of those universities which has been extremely reluctant to change in light of Title IX, one which has shown no enthusiasm, whatsoever, to embrace change—enthusiastically or otherwise—for the purpose of bringing to an end sex discrimination in its athletics program. LSU's athletic department was established in 1897 as a male domain. Throughout the 100 years since its inception, LSU has provided greater athletic opportunity for its male than female students. As noted earlier, LSU's history with regard to women's athletics and its accommodation of women student athletes has been, at best, one of passive resistance to change. Further, this resistance has not limited itself to the LSU campus. LSU moved forward to better accommodate its women's teams' needs only when it believed it was required to do so. Even when the university became convinced that forward movement was necessary, as it did in 1993, it moved forward following its conference, with no cohesive plan, but through a progression of starts, stops, and stalls.

This Court finds that the source of LSU's resistance to change in favor of compliance with Title IX is two-fold: LSU's assessment of its program as "wonderful"; and its archa-

---

**75.** Although not a formal investigation, Ms. Bonnette made several suggestions for improvement upon her visit to LSU. Plaintiffs' Exhibit # 133.

ic view of women and athletics. LSU's approach suggests ignorance of the changed social fabric in this country. LSU's outmoded approach to athletics includes antiquated assumptions about women's athletic interests and abilities and a failure to integrate the women's athletic program into the overall athletic framework at the university.

A primary factor in LSU's resistance has been Dean's opinion that the women's program is "wonderful." This evaluation, as noted above, seems to be based upon the fact that many of the women's teams which have been fielded for the past 15 or so years have been competitively successful regionally and at times, nationally. In acknowledging the competitive success of certain of the few women's teams, Dean seems to have reached the end of his assessment of the program: successfully competitive teams means a "wonderful" program. In focusing solely on this element, Dean led himself to believe that he was fully accommodating the female student population; therefore, with LSU's women's program being in the forefront of "women's athletics," there was no urgency toward expansion of athletic opportunities for women. Dean testified at trial he still believes his "women's program" to be wonderful; therefore, Dean's opinion seems to have remained notwithstanding the input of OCR's Ms. Bonnette, nor the aforementioned handicaps under which the women's soccer team is laboring or the fact that the fast pitch softball team has yet to come fully online three years after he acknowledged the need for additional accommodation of women's athletic interests and abilities, or his total ignorance of the true interests and abilities of his female student population.

In the seven decades that LSU's athletic department was in existence prior to the enactment of Title IX, disparate treatment of male and female athletes might have been understood by a distinctly different social fabric than exists today. This disparate treatment was based upon assumptions about women's interests and abilities which were argued to be limited by social parameters imposed upon women's behavior which no longer prevail, locally, regionally or nationally. Rather than taking notice of the enormous social change which has taken place in the past 25 years, LSU has continued to assume athletics is as it once was, a traditionally male domain, and its women students did not want to participate in athletics in the same manner and to the same extent as its men, and acted accordingly. By failing to investigate or test its assumptions about its female students, LSU remained ignorant of its student population and of the changing social and athletic world. Seemingly, the university remains unaware that females who participate in varsity sport are athletes who happen to be female and not females who happen to wish to be athletes, and that today's athletic programs encompass both male and female sports rather than being two separate worlds.

The Pinedas have proved LSU's assumptions wrong, in at least one respect. How wrong LSU has been cannot be known unless and until LSU identifies the desire and ability of its female student population to participate in sports and evaluates that information against the participation opportunities offered its male and female students.

In addition to outdated assumptions, LSU also continues as a practical reality, to segregate its athletic program from its women's athletic program. In the years since the enactment of Title IX, athletics has become gender-neutral; athletics at LSU has not. Whereas the country has moved toward a view of college athletics which encompasses athletics as a whole, LSU continues to have its athletic program, traditionally exclusively for males, and its "women's program" for women. Although the two programs are combined under the same loose administrative umbrella, this Court finds they are seen and treated as separate and apart.

LSU sees its "women's program" as just that—a women's program. The "women's program" is something separate, distinct, and apart from the "athletic program." It is this dichotomy which creates the problem and defines LSU's actions here. When it bolstered LSU's reputation to do so, the university *did* accommodate women's interests and abilities in order to field successful women's teams. However, because this arena is outside the traditional athletic program, it has

not commanded a comparable focus of enthusiastic commitment.

This Court finds that LSU, through the actions of its Athletic Director, Joe Dean, was negligent in not adapting to the changing social and athletic landscape. However, LSU's actions are the byproduct of arrogant ignorance, the adherence to outdated attitudes and assumptions, and the confusion surrounding Title IX and its true intent, rather than the result of intentional discrimination. As this Court finds no intent on the part of LSU to discriminate on the basis of sex, there can be no damages awarded to the Pinedas. Consequently, there will be no Phase Two of the trial.

**B. Equitable Relief: Reasonable and Adequate Plan**

The Policy Interpretation issued by OCR includes enforcement provisions.[76] With regard to enforcement, OCR has determined that, once a university has been found to be in violation of Title IX, it can avoid a finding of non-compliance by having in place an adequate plan for remedying the violations within a reasonable period of time. In the context of this suit, this Court is not at liberty to find the university in violation of Title IX then decline to take any action as a result of that finding. However, the question of whether LSU has a reasonable and adequate plan to remedy its violations of Title IX is relevant at this juncture.

The process of creating, molding, expanding, and otherwise adjusting an athletic program is a long one. An athletic program cannot be established overnight, or even over a few months. First comes the process of finding a competent coach for the new team—a search which can take months. Next, LSU, not unreasonably, allowed its new coaches one year to set up their teams, including recruiting players, accumulating necessary equipment, and setting up the program itself.

Because of the time delays inherent in the process of remedying Title IX violations, immediate relief often simply is not available. In view of the inevitable time delay, and this Court's lack of expertise in micromanaging athletics departments, William Davis, Joe Dean and the Louisiana Board of Supervisors are ORDERED to produce a reasonable and adequate plan to bring LSU's athletics program into compliance with Title IX.

This Court finds that, at this time, LSU has no adequate plan. LSU has only verbal commitments, supported by vague intentions, resulting in erratic, random action. No cohesive, structured plan designed to encompass the complexity of the problem exists. This lack has already cost LSU's athletics department: the NCAA Self–Study resulted in only provisional certification, rather than full certification.[77]

At trial, LSU presented testimony that it was "in the process" of creating a written plan for addressing the NCAA's concern with gender equity in its intercollegiate athletics program. However, no writing of any nature was presented, nor did the testimony support a finding that a true plan existed—written or otherwise. Instead of a plan, this Court heard only unsupported, shifting, vague assertions.

This Court finds there is no credible evidence to support a finding that an adequate plan to address LSU's violations of Title IX exists. In fact, there is no plan of any kind, at all. No plan exists to institute a method to identify the interests and abilities within the male and female student populations at LSU, nor a plan to evaluate the athletic opportunities presented in light of those identified interests and abilities,[78] nor even a

---

**76.** 44 Fed.Reg. at 71,418–19.

**77.** Plaintiffs' Exhibits Nos. 820–822. Correspondence from NCAA to Chancellor William Davis and from Chancellor Davis to NCAA concerning the need for LSU to submit a "comprehensive institutional plan for addressing gender equity in its intercollegiate athletics program."

**78.** Title IX Athletics Investigator's Manual, p. 27. Although the Investigator's Manual indicates "[a]

survey or assessment of interests and abilities is not required by Title IX regulations or by the Policy Interpretation. A survey or assessment may be required *as part of a remedy* when OCR has concluded that an institution's current program does not equally effectively accommodate the interests and abilities of its students." (emphasis added).

plan to effectively and timely implement the decision it has already made to add intercollegiate varsity women's soccer and fast pitch softball.[79]

The lack of a reasonable and adequate plan for implementing the women's soccer program is clear from a brief review of the implementation progress thus far. LSU made a commitment to add women's intercollegiate varsity soccer in 1993. Coach Hickey, the soccer coach, was hired by LSU in August, 1994, and was given time to develop her program prior to intercollegiate competition in Fall 1995. A soccer field was designated, which also acted as the football competition field for an adjoining high school, University High. Although modifications were made to this field, including the moving of certain fences and extension of the field in order to accommodate soccer, the field remained a "crowned field" and smaller than most regulation soccer fields with fencing which limited outbound play and posed a safety hazard—all of which is problematic for soccer play. Similarly, it became apparent with the commencement of the 1995 soccer season, and coextensively the LSU football season, that the practice field assigned to the soccer team was not acceptable. The practice field traditionally has been used as a parking lot during LSU varsity football games, resulting in damage to the turf, debris, and other hazardous playing conditions.

As late as October 1995, when trial commenced, land was being sought to construct a proper soccer facility. Testimony indicated land had been identified and new "plans" were in development to construct a permanent soccer facility. At time of trial, two years after LSU's commitment to institute soccer, "plans" for the women's soccer team's facility are, at best, sketchy and indeterminate. The nature and scope of the facility has not been identified, no credible date for completion was given, no concrete plans for the facility exist, and no final allotment of funds has occurred. LSU has been involved in reactive crisis management rather than planning of any type.

The "plan" with regard to the softball team is similarly nebulous. Commitment to add a women's fast pitch softball team was made by LSU in 1993. Intercollegiate competitive softball is scheduled to begin in 1996. In January, 1996, one coach has been hired and limited recruiting has occurred, but effective intercollegiate competition in fast pitch softball within the next few months remains a promise rather than a reality. The history of the softball facility is even more checkered than that of the soccer facility. The plans for the facility were continuing to unfold during the trial in October, 1995 notwithstanding LSU's decision and commitment over two years earlier to add intercollegiate varsity fast pitch softball. This Court finds it highly unlikely that the complete facility as described by LSU officials at trial will be available for intercollegiate varsity play on the LSU campus for the 1996 season.

This brief review of the history of the development of women's soccer and fast pitch softball reveals that LSU has relegated both to an afterthought and has engaged in crisis management when forced to act. No plan exists for implementation of these two programs, nor does any plan exist for bringing the university into compliance with Title IX.

This Court ORDERS William Davis, Joe Dean and the Louisiana Board of Supervisors immediately to effectively accommodate LSU's female population pursuant to Title IX or to submit an adequate plan for such compliance as expeditiously as possible but within twenty (20) days of receipt of this Order.

Plaintiffs also have asked this Court for specific injunctive relief. This Court DENIES all requests for specific injunctive relief prayed for by plaintiffs beyond the additional equitable relief of ordering LSU to comply with Title IX. In making its denial, this Court notes that the remaining relief requested by plaintiffs is of a type not mandated by Title IX and certain of the requests would not grant relief to the named plaintiffs. Title IX does not require specific intercollegi-

---

**79.** This Court is not unaware of the testimony by certain members of the LSU faculty that a "plan" for instituting and implementing soccer and fast pitch softball does exist, although not written. This Court is not holding that a plan always need be written to exist; however, this Court finds under the evidence presented in this case that no true plan of any kind exists.

ate sports be added or specific intercollegiate sports be reduced or that aggregate expenditures for members of each sex be equal,[80] nor does this Court believe that any of denied injunctive relief is appropriate under the factual findings made by this Court.

## CLASS

Plaintiffs had moved this Court for certification of an injunction class, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), of "all LSU women students enrolled at any time since February, 1993 or who seek to enroll or become enrolled during the course of this litigation and who seek or have sought to participate and or were deterred from participating in intercollegiate varsity athletics funded by LSU."

Federal Rules of Civil Procedure 23 demands that all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) be satisfied for certification of a class.[81]

The purpose of class actions is to conserve "the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." [82] "In determining the propriety of a class action, the question is not whether plaintiff or the plaintiffs have stated a cause of action or will prevail on the merits, but whether the requirements of Federal Rules of Civil Procedure 23 are met." [83] Movants have the burden of demonstrating the propriety of class certification.[84] A class action may only be certified if, after a rigorous analysis, the trial court is satisfied that the prerequisites of Rule 23(a) have been met.[85] "The District Court has wide discretion in deciding whether to certify a proposed class." [86]

This Court found in its original ruling of September 14, 1995, based upon the evidence presented at that time, that the *Pederson* plaintiffs had Article III standing to assert a claim pursuant to Title IX based on LSU's alleged failure *to provide effective accommodation* in varsity athletics and that plaintiffs had the requisite standing to seek class certification based on that claim of ineffective accommodation. However, as noted above, after hearing full evidence at trial this Court has found that the *Pederson* plaintiffs do not have standing to assert claims for ineffective accommodation and their claims have been dismissed. This Court has further held that only the Pinedas have the necessary standing to bring suit, even as to the limited question

**80.** 45 C.F.R. § 86.41(c).

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing *equality of opportunity* for members of each sex. (emphasis added)

**81.** Federal Rule of Civil Procedure 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if:
(1) the class is so numerous that joinder of all members is impracticable,
(2) there are questions of law or fact common to the class,
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
(4) the representative parties will fairly and adequately protect the interests of the class. Federal Rule of Civil Procedure 23(b) states:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**82.** *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982), (quoting *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979)).

**83.** *Floyd v. Bowen,* 833 F.2d 529, 534 (5th Cir. 1987) (quoting *Miller v. Mackey Int'l, Inc.,* 452 F.2d 424 (5th Cir.1971)).

**84.** *Murillo v. Musegades,* 809 F.Supp. 487, 501 (W.D.Tex.1982).

**85.** *Falcon,* 457 U.S. at 156, 102 S.Ct. at 2370.

**86.** *Shipes v. Trinity Industries,* 987 F.2d 311, 316 (5th Cir.1993), *cert. denied sub. nom., Trinity Industries, Inc. v. Shipes,* —— U.S. ——, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993).

of effective accommodation. As such, only the Pinedas are eligible to act as the representatives of a putative class.

Therefore, this Court considered only the Pinedas' request for class certification and only for those claims for which standing exists.[87] As stated, plaintiffs requested a class defined as "all LSU women students enrolled at any time since February, 1993 or who seek to enroll or become enrolled during the course of this litigation and who seek or have sought to participate and/or were deterred from participating in intercollegiate varsity athletics funded by LSU."

However, in a September 14, 1995 ruling, this Court held that a class would be maintained as to the only issue for which the plaintiffs had been determined to have standing, i.e., claims for effective accommodation. This ruling necessitated delineation of the class as follows: [88]

Those female students enrolled at LSU since 1993 and any time thereafter who have sought or seek to participate in varsity intercollegiate athletics at LSU but who are or were not allowed such participation due to LSU's failure to field teams in said female varsity athletics.

This Court further held the class certification to be provisional, instructing plaintiffs that additional proof would be necessary in order for the class to be fully certified. However, thereafter, this Court determined that certification was improvidently granted, and decertified the class.[89]

This Court cautioned plaintiffs' counsel in its original ruling that the evidence presented on numerosity was not sufficient to uphold a class certification and granted plaintiffs the opportunity to bolster that information. This Court remained unconvinced that such nu-

merosity exists. However, even if numerosity were sufficient to sustain class certification, the time was ripe for revisiting the entire question of class.

 Efficiency and economy of litigation is the principal purpose underlying Rule 23 certification.[90] This Court is acutely aware that the purpose for which Rule 23 was created is to allow for efficiency and economy of litigation.

Certification of a class in this matter would have served two primary purposes. First, litigation on behalf of the entire class would allow for an opportunity to remedy the entirety of the harm inflicted by LSU's failure to effectively accommodate its female population. Second, according to plaintiffs, a class is necessary to protect the future viability of this Court's judgment and jurisdiction. These are addressed in turn.

Plaintiffs' complaint sought monetary relief for the named individuals and equitable relief for both the individuals and the class. Monetary relief has hereinabove been denied the individually named plaintiffs due to a failure to prove the requisite intent necessary to allow for monetary damages and would also, thus, be denied to any class which might be certified.[91]

Based upon a finding that Title IX has been violated, plaintiffs have been granted equitable relief in the form of a declaration that LSU is out of compliance with Title IX and an injunction for LSU to either come into compliance immediately or provide this Court with an adequate plan to do so with all due haste.

First, as to putative class members who attended LSU in the past or are now attending the university, it is probable that, by

---

87. See Warth v. Seldin, 422 U.S. at 502, 95 S.Ct. at 2207; O'Shea v. Littleton, 414 U.S. at 494, 94 S.Ct. at 675.

88. Pursuant to Fed.R.Civ.Pro. 23 and Fed.R.Civ. Pro. 16, this Court has discretion in determining whether a class action is "to be so maintained," the scope of the class for which plaintiffs will be allowed to litigate, and the terms and handling of a class action. This Court decertified the class by Memorandum Ruling dated January 11, 1996.

89. Fed.R.Civ.P. 23(c)(1) specifically provides that an order allowing a class action to be maintained may be conditional, and may be altered or amended before the decision on the merits. See Memorandum Ruling of January 11, 1996.

90. American Pipe & Construction Co. v. The State of Utah, 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974).

91. Plaintiffs have not requested monetary damages for the class as of trial.

violating Title IX, LSU has also injured other female students at LSU. Plaintiffs argued that class certification was necessary in order to provide a remedy to other female students who may have been harmed. This argument, however, was not persuasive. In view of the lack of a finding of intent, others who may have been harmed in the past would likewise not be entitled to monetary relief. As to the equitable relief, it is broadly construed to inure to the benefit of all female athletes who seek equal opportunity to participate in sports who are presently attending or in the future will attend LSU and would not benefit those no longer at LSU.

Second, as to putative class members who will, in the future, attend LSU, plaintiffs argue the possibility exists that LSU will once again violate Title IX after being ordered to comply by this Court. Should that event occur, anyone who wishes can make a complaint with the Office of Civil Rights and instigate an administrative investigation and evaluation of LSU. Further, any woman who believes she *has sustained personal, individualized injury, can at that time petition a Court for redress for her particular individual injury.* Consequently, potential future injured parties will not, and should not, be bound by this Court's finding on intent as to future action by LSU. If LSU, after having had its actions reviewed by this Court and being ordered into compliance, decides to violate Title IX, intent will and should be a new issue for determination at that time. To bind future litigants by this Court's present findings as to intent would be unjust. Therefore, to create a class to include future potential litigants would have been unjust. Consequently, to certify a class to include those future putative members would not have benefited efficiency and economy and would, moreover, have created the possibility of unjust result.

In addition to arguing that class certification was necessary to properly remedy the harm inflicted by LSU, plaintiffs also argued that certification was necessary in order to allow for continuance of this Court's jurisdiction, if necessary, beyond the date that the Pinedas graduate. This argument also did not carry great weight. Assuming, *arguendo*, that compliance will not be achieved prior to the Pinedas' leaving LSU, there would need be adjustment of named plaintiffs. However, should that event occur, this Court recognizes no reason not to allow plaintiffs an opportunity to substitute other plaintiffs with standing at that time. A very similar proceeding would be necessary, even if a class were certified. Class representatives, as noted above, must have standing individually, in order to litigate on behalf of a class. Were the Pinedas to be appointed as class representatives and lose their standing, plaintiffs' counsel would require an opportunity to seek appointment of new class representatives. In either circumstance, the adjustment would be necessary. Therefore, certification of a class would not have effected the efficiency or economy of the proceeding in the event the Pinedas lose their standing for equitable relief. Without that affirmative need for class certification to protect this Court's jurisdiction, this Court was not inclined to make this matter more complicated than it necessarily must be.

Consequently, this Court found that, notwithstanding the arguments of numerosity, which in and of themselves are inherently weak, the underlying purpose of Rule 23 to promote judicial efficiency and economy would not have been met by certifying a class herein.

This Court did not hold that in a Title IX case with facts different from those presently before the Court, a class certification could not be desirable and proper; however, under the particular facts of this case, this Court found that class certification would not have acted to encourage the underlying purpose of efficiency and economy of litigation.

After hearing all arguments and weighing all evidence presented herein, this Court found that, certification of a class would not have acted to increase the efficiency or economy of this litigation. Rather, certification of a class would have had the opposite effect. Consequently, under the authority and discretion granted to this Court, the class was DECERTIFIED by Memorandum Ruling

prior to final decision on the merits.[92]

## ATTORNEY'S FEES

Plaintiffs seek attorney's fees pursuant to the Civil Rights Attorney's Fees Award Act of 1976, 90 Stat. 2641, as amended, 42 U.S.C. § 1988, which provides in pertinent part:

In any action or proceeding to enforce a provision of Sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 . . ., or title VI of the Civil Rights Act of 1964 . . ., the court, in its discretion, may allow the *prevailing party*, other than the United States, a reasonable attorney's fee as part of the costs. (emphasis added)

The Supreme Court continues to define "prevailing party," and thus, has determined that "Congress intended to permit the . . . award of counsel fees only when a party has prevailed on the merits." *Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 572, 121 L.Ed.2d 494 (1992) (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980)) (per curiam).[93]

Accordingly, "in order to qualify for attorney's fees under § 1988 a plaintiff must be a 'prevailing party.'" *Farrar*, 506 U.S. at 109, 113 S.Ct. at 572. The Supreme Court has granted a "'generous formulation' of the term," holding "'plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Farrar*, 506 U.S. at 109, 113 S.Ct. at 572 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978))).

The Supreme Court also notes, "[L]iability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant." *Farrar*, 506 U.S. at 109, 113 S.Ct. at 572 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985)).

Against this background, the Supreme Court further defined the definition of "prevailing party" in three (3) cases prior to their decision in *Farrar* in 1992.[94] Accordingly, in order to qualify as a "prevailing party" a plaintiff is required to prove "the settling of some dispute which affects the behavior of the defendant towards the plaintiff." *Hewitt*, 482 U.S. at 761, 107 S.Ct. at 2676 (emphasis omitted).[95] The Supreme Court makes clear in *Rhodes v. Stewart*, 488 U.S. 1, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (*per curiam*), "that a judgment—declaratory or otherwise—'will constitute relief, for purposes of § 1988, if, and only if, it affects the behavior of the

---

**92.** Fed.R.Civ.Pro. 23(c)(1). Memorandum Ruling of January 11, 1996.

**93.** Plaintiff, Joseph Farrar, "[F]iled a lawsuit demanding 17 million dollars from six defendants. After 10 years of litigation and two trips to the Court of Appeals, he got one dollar from one defendant." *Farrar*, 506 U.S. at 116, 113 S.Ct. at 575 (O'Connor, J., concurring).

The district court granted plaintiff $280,000 in fees, $27,932 in expenses and $9,730 in prejudgment interest. The Fifth Circuit, reversed the fee award, finding "the plaintiffs were not prevailing parties and therefore, ineligible for fees under § 1988." *Farrar*, 506 U.S. at 107, 113 S.Ct. at 571.

The Supreme Court found that Farrar was a "prevailing party;" however, declined to grant attorney's fees pursuant to 42 U.S.C. § 1988, on the basis that plaintiff's "failure to prove an essential element of his claim for monetary relief" should result in "no fee at all." *Farrar*, 506 U.S. at 115, 113 S.Ct. at 575.

**94.** *Texas State Teachers Assn. v. Garland Independent School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Rhodes v. Stewart*, 488 U.S. 1, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (per curiam); *Hewitt v. Helms*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

In *Hewitt* the Supreme Court denied "prevailing party" status to an inmate in an action against state prison officials for alleged due process violations when his claim resulted in no relief on the merits, only an "interlocutory ruling that his complaint should not have been dismissed for failure to state a Constitutional claim." *Hewitt*, 482 U.S. at 760, 107 S.Ct. at 2675–76.

**95.** In *Rhodes*, the Supreme Court declined to award attorney's fees based on the grant of a declaratory judgment which by the time the district court entered judgment, one of the plaintiffs had died and the other was no longer in custody. *Rhodes*, 488 U.S. at 2, 109 S.Ct. at 202.

defendant toward the plaintiff.'" *Farrar*, 506 U.S. at 110, 113 S.Ct. at 572 (quoting *Rhodes*, 488 U.S. at 4, 109 S.Ct. at 203). In *Rhodes* the declaratory judgment subsequently resulted in "modification of prison policies," however, it did not effect either plaintiff as "one of whom was dead and the other released." *Rhodes*, 488 U.S. at 4, 109 S.Ct. at 203.[96]

■ Accordingly, the present status of "prevailing party" in a civil rights litigation pursuant to 42 U.S.C. § 1988 is now defined as follows:

[a] civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, *Hewitt, supra*, 482 U.S. at 760, 107 S.Ct. at 2675, or comparable relief through a consent decree or settlement, *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. See *Hewitt, supra*, 482 U.S. at 764, 107 S.Ct. at 2677. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." *Rhodes*, 488 U.S. at 4, 109 S.Ct. at 203. Only under these circumstances can civil rights litigation effect "the material alteration of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party. *Texas State Teachers, supra*, 489 U.S. at 792–793, 109 S.Ct. at 1493. In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.[97]

Therefore, plaintiffs' "eligibility" for attorney's fees rests on "the material alteration of the legal relationship between the parties." *Farrar*, 506 U.S. at 111, 113 S.Ct. at 573. "Of itself, 'the moral satisfaction [that] results from any favorable statement of law' cannot bestow prevailing party status." *Farrar*, 506 U.S. at 112, 113 S.Ct. at 573–74 (quoting *Hewitt*, 482 U.S. at 762, 107 S.Ct. at 2676). Further, "[N]o material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." *Farrar*, 506 U.S. at 113, 113 S.Ct. at 574.

■ The Pinedas have prevailed in this matter by forcing LSU to provide opportunity for them to participate in a fast pitch softball program which is effectively planned and implemented. They will be granted the opportunity to try out for the newly created intercollegiate varsity fast pitch softball team which has the necessary tools to. effectively compete in Division I play. Although LSU argues it had committed to institute fast pitch softball prior to the Pinedas' suit and had done so as of trial, this Court did not find LSU credible as to its commitment to fully implement its decision. However, now LSU must immediately fully institute and accommodate a Division I fast pitch softball team or provide an adequate plan for such implementation. The Pinedas can now try out for and if successful, play for the team in a competitive facility and with all necessary tools to effectively compete or for a team which has an adequate plan for such implementation. But for the Pinedas, this Court is convinced LSU would have continued to drag its feet. Although defendants argue the Pinedas have not forced change—this Court disagrees. The change might be subtle, but

---

**96.** In *Texas State Teachers Assn. v. Garland Independent School District*, the Court further defined its rulings in *Hewitt* and *Rhodes* and held, "the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers*, 489 U.S. at 792, 109 S.Ct. at 1493.

In *Texas State Teachers*, The Supreme Court further emphasized that "[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties."

*Id.* at 792–793, 109 S.Ct. at 1493. The Court found the plaintiffs to be prevailing parties as they "obtained a judgment vindicating [their] First Amendment rights [as] public employees" and "materially altered the [defendant] school district's policy limiting the rights of teachers to communicate with each other concerning employee organizations and union activities." *Id.* at 793, 109 S.Ct. at 1494.

**97.** *Farrar*, 506 U.S. at 111–12, 113 S.Ct. at 573.

928

it is sufficient to be a prevailing party.[98] The *degree of change* does not control the *award* of attorney's fees, rather, impacts the *amount* of attorney's fees awarded.[99]

 This Court has determined plaintiffs, Cindy and Karla Pineda, are eligible for a fee award based on their "prevailing party" status. However, the inquiry under § 1988 does not end with a determination that plaintiffs are "prevailing parties." Having determined that this litigation "materially alters the legal relationship between the parties," a determination must now be made as to the "degree of plaintiff's overall success [which] goes to the reasonableness of a fee award." *Texas State Teachers,* 489 U.S. at 793, 109 S.Ct. at 1493; *Farrar,* 506 U.S. at 114, 113 S.Ct. at 574; *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The Supreme Court instructs "[i]ndeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar,* 506 U.S. at 114, 113 S.Ct. at 574 (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941).

The Pinedas sought declaratory, injunctive and monetary relief from defendants. As stated, this Court denied the preliminary injunctive relief and via this opinion, has declined to grant the particularized injunctive relief sought. Further, this Court found plaintiffs failed to prove the requisite element of intent necessary to justify monetary damages. Therefore, the only relief sought by plaintiffs which has been granted by this Court is declaratory relief wherein this Court has found LSU is not in compliance with the mandates of Title IX and thus, injunctive relief ordering LSU to immediately comply or present a plan which will address said non-compliance.

 The Supreme Court in *Farrar* discusses the responsibility of the court in its determination of reasonable fees that may be granted under § 1988 and instructs "[I]f 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.'" *Farrar,* 506 U.S. at 114, 113 S.Ct. at 574 (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941). Further, "'[W]here recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought.'" *Farrar,* 506 U.S. at 114, 113 S.Ct. at 575 (quoting *City of Riverside v. Rivera,* 477 U.S. 561, 585, 106 S.Ct. 2686, 2700, 91 L.Ed.2d 466 (1986)). "Such a comparison promotes the court's 'central' responsibility 'to make the assessment of what is a reasonable fee under the circumstances of the case.'" *Farrar,* 506 U.S. at 115, 113 S.Ct. at 575 (quoting *Blanchard v. Bergeron,* 489 U.S. 87, 96, 109 S.Ct. 939, 946, 103 L.Ed.2d 67 (1989)).

Plaintiffs chose to file a *private right of action* rather than to file an administrative complaint with OCR. Monetary damages are allowable for plaintiffs in a private right of action; they are not allowable under an administrative action under OCR. The declaratory relief granted here is of the same nature which could be provided by OCR through the administrative proceeding. Consequently, the monetary damages, arguably, were at least one of the, if not the primary, purpose for the exercise of a private right of action.

 The Supreme Court further instructs that any damages awarded pursuant to § 1988 "must always be designed 'to compensate injuries' caused by the [constitutional] deprivation." *Farrar,* 506 U.S. at 115, 113 S.Ct. at 575 (quoting *Memphis Community School District v. Stachura,* 477 U.S. 299, 309, 106 S.Ct. 2537, 2544 (1986) (quoting *Carey v. Piphus,* 435 U.S. 247, 256–57, 264, 98 S.Ct. 1042, 1048–49, 1052, 55 L.Ed.2d 252 (1978))). Further, the Supreme Court admonishes "that fee awards under § 1988 were never intended to 'produce windfalls to attorneys.'" *Farrar,* 506 U.S. at 115, 113 S.Ct. at 575 (quoting *Riverside,* 477 U.S. at 580, 106 S.Ct. at 2697 (plurality opinion) (quoting *S.Rep. No.,* 94–1011, p. 6 (1976)

---

**98.** *Farrar,* 506 U.S. 103, 113 S.Ct. 566. *See supra* note 93 and accompanying text.

**99.** *Id.*

U.S.Code Cong. & Admin.News, 1976, pp. 5908, 5913)).

■ Existing jurisprudence instructs this Court to reduce the hours claimed by plaintiffs' counsel to account for time expended on unsuccessful claims. The Supreme Court in both *Hensley* and *Texas State Teachers* instructs as follows:

> When claims are based on different legal facts and legal theories, the district court should treat the claims as separate suits and award attorneys fees only for time expended on the successful claims. On the other hand, when the claims arise from a common core of facts and involve related legal theories, the district court should attempt to arrive at a reasonable fee award 'either by attempting to identify the specific hours that should be eliminated or by simply reducing the award to account for the limited success of the plaintiff.'

*Wyatt,* 928 F.2d 718, 724 (citing *Hensley,* 461 U.S. at 434–36, 103 S.Ct. at 1939–41); *Texas State Teachers,* 489 U.S. at 789–90, 109 S.Ct. at 1492.

In this litigation, the Court has found that the Pinedas are prevailing parties such that they are eligible for an award of attorney's fees. However, suit was initially instituted by the *Pederson* plaintiffs who the Court has found did not have the requisite standing. The claims of the *Pederson* plaintiffs were dismissed; therefore, they are not prevailing parties as defined by the Supreme Court. Thus, this litigation presents both of the factual scenarios outlined by the Supreme Court.

First, this is a consolidated action, therefore, the claims of the *Pederson* plaintiffs and the Pinedas, although similar, are distinct. Judge Polozola, on March 30, 1995, signed the order consolidating the *Pineda* case, transferred from the Eastern District, with the *Pederson* case then pending before this Court. However, it was not until May 25, 1995 that this Court signed the Joint Response to Consolidation and Addendum to the Scheduling Order which fully consolidat-

ed both the *Pederson* and *Pineda* actions. Accordingly, as in *Wyatt, supra* there is a distinct severable point between the two (2) claims such that they may be treated as separate suits. Accordingly, this Court will award attorney's fees only from May 25, 1995 forward.[100]

■ Further, as admonished by the Supreme Court, this Court must account for the lack of success of the *Pederson* plaintiffs and the limited success of the Pinedas in this litigation, which requires the Court to "identify specific hours that should be eliminated or ... reduce the award to account for the limited success of the plaintiffs." *Hensley,* 461 U.S. at 434–436, 103 S.Ct. at 1939–41; *See also, Texas State Teachers,* 489 U.S. at 790–91, 109 S.Ct. at 1492. Accordingly, this Court will address only those hours and expenses which reflect the work which would have been done in order to present the *Pineda* claim in this litigation.

As both parties agreed that should attorney's fees become an issue, proof of same could be produced after Phase I, plaintiffs are hereby ORDERED to present within twenty (20) days of filing of this opinion full documentation and any evidence they feel necessary to establish the amount spent on the *Pineda* claim as limited by this Court. Once received, this Court will make its determination of the amount of attorney's fees to award to the Pinedas.

### PLAINTIFFS' MOTION FOR SANCTIONS

Plaintiffs have filed motion requesting this Court sanction defendants, "Louisiana State University, Joe Dean, William E. Davis, defendants' counsel, and any related parties" for allegedly withholding documents. The plaintiffs assert Federal Rules of Civil Procedure 16 and 26, 28 U.S.C. § 1927, and this Court's inherent power to control its proceedings as the basis for sanctions. The plaintiffs request this Court grant the following sanctions:

**100.** In *Wyatt,* the Fifth Circuit awarded fees for hours expended after the date of a declaratory judgment and further reduced the hours claimed

by 50% prior to the declaratory judgment. *Wyatt,* 928 F.2d at 724.

930

(1) Enter a finding of fact adverse to Joe Dean, William E. Davis, Pat Culbertson, David Bahnsen, and Gregory LaFleur with respect to their credibility on the claim that LSU did not know the National Collegiate Athletic Association ("NCAA") required LSU to submit a written plan on achieving gender equity;

(2) Enter a finding of fact that LSU does not have, and has never had, even in draft form, a plan for complying with Title IX;

(3) Enter a finding of fact that even if LSU had a plan for complying with Title IX, LSU did not commit it to writing because to have done so would have resulted in an admission that LSU was not in compliance with Title IX and was then operating under an inadequate time table and plan for compliance;

(4) Enter a finding of fact that LSU deliberately delayed developing or even drafting a plan until after trial to avoid necessary and inevitable admissions;

(5) Order the defendants and their attorneys to locate any and all documents responsive to discovery requests that were not produced and, under oath, certify specifically what was done to locate same;

(6) Determine each person and entity responsible for withholding documents, reprimand same, and levy monetary sanctions to be paid either to the Plaintiffs or the Court, or into a scholarship fund for female athletes, with the provision that the sanctions be paid personally by the responsible parties and not reimbursed by LSU, the Tiger Athletic Foundation, or any other entity; and

(7) Award plaintiffs the attorney's fees incurred in bringing this Motion for Sanctions.

## I. Specific Violations Urged by Plaintiffs

The plaintiffs allege first that various letters between LSU and officials of the NCAA were within the scope of plaintiffs' requests for production of documents but were not produced by the defendants until October 30, 1995, the day before the defendants rested at trial. Plaintiffs made several requests, including the production of "[a]ll documents that record, reference, or otherwise reflect or relate to communications of LSU, Dean and/or Davis with any member(s) of the NCAA from 1984 to the present regarding Title IX, gender equity, and/or LSU's, Dean's and/or Davis' suggestion or desire to withdraw from the NCAA," "all documents which reflect, refer or relate to LSU's gender equity study, LSU's cooperation with the OCR with respect to any formal or informal gender equity studies or investigations, and LSU's response to the Southeastern Conference's and/or National Collegiate Athletic Association's gender equity studies."

Certain documents were provided pursuant to these requests; however, plaintiffs argue the following were not timely produced and fall within the requests:

(1) December 9, 1994 facsimile from LSU Executive Vice–Chancellor James M. Coleman to David Bahnsen, LSU Assistant Athletic Director for NCAA compliance, and Pat Culbertson, Chair of LSU's Athletic Counsel, concerning the NCAA's Peer–Review Team's Report on LSU's self-study;

(2) January 13, 1995 letter from Robert W. Thomas, NCAA Compliance Representative, to David Bahnsen, LSU Assistant Athletic Director for NCAA compliance regarding LSU's plan for addressing gender issues;

(3) January 17, 1995 letter from LSU Executive Vice–Chancellor James M. Coleman to Robert W. Thomas, NCAA Compliance Representative, enclosing LSU's response to the Peer Review Team's report on LSU's self-study;

(4) March 2, 1995 letter from R. Gerald Turner, Chair of the NCAA Committee on Athletic Certification to LSU Chancellor William E. Davis, enclosing a summary of the NCAA Committee on Athletics Certification's decision to certify LSU only provisionally pending LSU's submission of a written gender-equity plan;

(5) May 16, 1995 letter from LSU Chancellor Davis to R. Gerald Turner, Chair of the NCAA Committee on Athletic Certification, complaining that the self-study instrument did not require a written gender-equity plan; and

(6) June 6, 1995 letter from R. Gerald Turner, Chair of the NCAA Committee on Athletic Certification to LSU Chancellor William E. Davis, regarding the need for a written plan addressing gender issues.

Plaintiffs also requested all documents which "reflect, refer or relate to any and all efforts by LSU to establish women's softball as a varsity sport" and "[d]ocuments which provide a complete list of all athletic facilities which LSU has plans for or is considering constructing or renovating, including an estimate of the costs for such construction/renovation and the planned revenue sources for each construction/renovation." Again, certain documents were produced pursuant to these requests; however, plaintiffs allege that during trial testimony, witnesses associated with LSU[101] testified regarding plans, drawings, and itemization of costs for a proposed new softball facility which had not been produced.

Plaintiffs also requested "[a]ll surveys or assessments of student interest in all athletics from 1984 to the present" and "[a]ll documents which regard or reflect, in any way, efforts undertaken by LSU from the 1984–1985 academic year until the present to determine the interest of LSU students in LSU's intercollegiate sports program in general and/or in particular sports." Once again plaintiffs allege LSU Chancellor Davis and LSU Director of Recreational Sports Randy Mast testified LSU conducted surveys of students regarding their sports interests. The surveys referenced by the witnesses were not produced by defendants until defendants submitted their response to plaintiffs' Motion for Sanctions.[102]

The plaintiffs also requested "[e]very document ... addressed from ... Beth Pederson." At trial, Soccer Coach Miriam Hickey testified regarding a letter written to her by Beth Pederson. Coach Hickey testified the letter was delivered to her by Beth Pederson on August 31, 1995; however, LSU did not produce the letter until during trial. The letter was introduced into evidence by the defendants at trial without objection by plaintiffs.

Finally, plaintiffs assert that during the course of deposition, defendant, Joe Dean, was specifically asked if he had created any written documents following the LSU visit by Valerie Bonnette of the Office of Civil Rights. Dean testified in deposition that no written document was created following the OCR visit. In a second deposition, Dean again testified he did not recall writing a memo following Ms. Bonnette's visit. However, a memo dated March 25, 1993, was written by Joe Dean following Ms. Bonnette's visit. Plaintiffs allege they first obtained a copy of this memo during the deposition of volleyball coach Scott Luster on July 15, 1994.

In response, LSU asserts its correspondence with the NCAA regarding the NCAA Peer Review was not within the scope of plaintiff's request for production because the Peer Review was not related to Title IX. LSU argues gender equity was only a small "sub-part" of the NCAA Peer Review and the Review ultimately concluded LSU was "making a conscious effort to embrace the principles of gender equity." LSU further argued any written plan for addressing gender equity issues would have been inadmissible at trial under Federal Rule of Evidence 407 as a subsequent remedial measure.

LSU asserts the failure to produce the softball facility plans was inadvertent. The person coordinating the document production at LSU was unavailable and consequently, counsel attempted to contact the various offices to obtain documents. Counsel candidly admitted he failed to request the documents from the university official who had possession of those documents because that office was not located within the Athletic Department office building. LSU argues the late production of those documents did not prejudice the plaintiffs.

**101.** Chancellor William E. Davis, Vice–Chancellor Baudin, and Softball Coach Cathy Compton.

**102.** The defendants attempted to introduce testimony concerning the surveys regarding interest in recreational sports at trial. The introduction was objected to by plaintiffs and was stricken by this Court due to defendants' failure to produce the documents during discovery. However, the testimony was nonetheless, not relevant to any fact at issue as the survey did not contain information relevant to the Court.

As to the survey documents, LSU argues the surveys of university students do not assess the students' interest in athletics and therefore, are not within the discovery requests. However, the surveys do ask whether LSU's reputation in intercollegiate sports affected the students' decision to attend LSU. LSU argues the recreational sports survey is within the plaintiffs' discovery requests only if the request is given its broadest possible interpretation as the surveys do not relate to intercollegiate athletics.

LSU counsel assert they first became aware of the Beth Pederson letter during trial testimony. After testimony regarding the letter was heard, plaintiffs' counsel requested a copy of the letter. LSU counsel thereafter obtained a copy of the letter from Coach Hickey and produced the letter during trial. LSU also points out that plaintiff had knowledge of the letter and asserts no prejudice resulted to the plaintiffs due the production of the letter during trial.

LSU asserts the March 25, 1993 memo from Joe Dean regarding the OCR visit was produced in a timely fashion. The memo was produced to plaintiffs during the July 15, 1994 deposition of Scott Luster. Plaintiffs claim they were not aware of the memo until Scott Luster's deposition; however, on July 14, 1994, plaintiffs' counsel asked Joe Dean specific and detailed questions about a memo regarding the OCR visit on March 25, 1993. Therefore, LSU argues plaintiffs had knowledge of the memo prior to its production.

## II. Legal Basis For Sanctions

Plaintiffs argue Federal Rules of Civil Procedure 16 and 26, 28 U.S.C. § 1927, and this Court's inherent power to control its proceedings provide this Court with authority to sanction defendants, their attorneys, or both for their alleged violations of the discovery process.

Plaintiffs allege that due to the failure of the defendants to produce the above referenced documents, the defendants violated paragraph 7 of the Court's December 14, 1994 Scheduling Order. Paragraph 7 directed "all discovery must be completed on or before the deadline [of July 24, 1995]." Federal Rule of Civil Procedure 16(f) provides:

[i]f a party or party's attorney fails to obey a scheduling. ... order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

The sanctions incorporated by the reference from Rule 37 of Civil Procedure include:

B. An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

C. An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party; and

D. In lieu of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination.

Federal Rule of Civil Procedure 37(b)(2)(B), (C), and (D).

The plaintiffs also allege the failure to produce the documents was a violation of Federal Rule of Civil Procedure 26(e) and (g). Rule 26(e)(2) provides:

A party is under a duty seasonably to amend a prior response to a ... request for production ... if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Rule 26(g)(2) provides that:

Every discovery ... response ... made by a party represented by an attorney shall

be signed by at least one attorney of record ... The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:

> (A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;
>
> (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and
>
> (C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

Rule 26(g)(3) provides for the following sanctions for a violation of Rule 26(g)(2).

> If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

The plaintiffs also argue defendants' counsel are liable under 28 U.S.C. § 1927 based on discovery violations. 28 U.S.C. § 1927 provides:

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

Awards under 28 U.S.C. § 1927 are penal in nature. *Monk v. Roadway Express, Inc.*, 599 F.2d 1378, 1382 (5th Cir.1979) aff'd in relevant part sub. nom. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). "Strict construction of the statute is necessary so that the legitimate zeal of an attorney in representing her client is not dampened." *Browning v. Kramer*, 931 F.2d 340, 344 (5th Cir.1991) (citations omitted). Section 1927 authorizes awards only against attorneys, not against the parties. *Id.* Finally, Section 1927 "creates liability only for excess costs, expenses and attorney's fees reasonably incurred because of the attorney's unreasonable and vexatious multiplication of the proceedings." *Id.* Therefore, the district court must identify and demonstrate the actual fees and costs which the proscribed conduct has caused. *Id.* at 346.

Plaintiffs also assert the defendants' alleged violations of discovery requests and failure to provide documents may be sanctioned under this Court's inherent power. In *Chambers v. NASCO, Inc.*, the United States Supreme Court discussed the longstanding doctrine that courts have certain implied powers which are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962)). Inherent powers must be exercised with restraint and discretion including "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45, 111 S.Ct. at 2132–33. A court's inherent power is both "broader and narrower" than the various statutes and rules which provide for sanctions. *Id.* at 46, 111 S.Ct. at 2134. The Court's inherent power "extends to a full range of litigation abuses" but may only be used in cases of "bad faith conduct or willful disobedience" whereas other rules and statutes do not require a finding of bad faith but are limited to the specific noted violations. *Id.* at 46–47, 111 S.Ct. at 2134.

Plaintiffs concede that under Fifth Circuit jurisprudence the threshold for the use of this Court's inherent power to sanction is high. *Reed v. Iowa Marine & Repair*

*Corp.,* 16 F.3d 82; 84 (5th Cir.1994). Also, in *Topalian v. Ehrman,* the Fifth Circuit noted that when considering sanctions under *any authority* "the district court should carefully choose sanctions that foster the appropriate purpose of the rule, depending on the parties, the violation, and the nature of the case." 3 F.3d 931, 936 (5th Cir.1993) (quoting *Thomas v. Capital Security Services,* 836 F.2d 866, 877 (5th Cir.1988) (*en banc* )). Therefore, a district court's findings regarding sanctions should reflect the following four (4) factors:

> (1) What conduct is being punished or is sought to be deterred by the sanction;
>
> (2) What expenses or costs were caused by the violation of the rule;
>
> (3) Were the costs and expenses "reasonable," as opposed to self-imposed, mitigatable, or the result of delay in seeking court intervention; and
>
> (4) Was the sanction the least severe sanction adequate to achieve the purpose of the rule under which it was imposed.

*Topalian,* 3 F.3d at 937 (citations omitted).[103]

## III. Analysis of Sanctions

 This Court finds that as to the correspondence between various persons at LSU and the NCAA, such correspondence did fall within the plaintiffs' requests for production and should have been produced by defendants at the appropriate time during discovery and certainly prior to the time of trial. Despite LSU's assertion that the documents were irrelevant and inadmissible, admissibility is not the standard for discovery. Although the information ultimately might be found to be inadmissible, the standard for discovery is not admissibility, rather is whether or not the material could be reasonably anticipated to lead to discoverable material. The LSU/NCAA correspondence clearly addresses issues of gender equity, and therefore falls within the plaintiffs' requests for production. Regardless of LSU's belief regarding the relationship of the documents to Title IX or to the ultimate admissibility and relevance of the documents, the documents fall squarely within plaintiffs' request for production and within the standard for discovery. LSU was aware of the documents and failed to produce them.

This Court finds that as to the plans, drawings, and itemization of costs for the proposed softball field, such documents were within the plaintiffs' requests for production and should have been produced by the defendants during discovery. Counsel for LSU admits inadvertent failure to obtain these documents but argues no prejudice resulted to the plaintiffs. However, that determination addresses the need for sanctions not whether the documents should have been produced. This Court finds that these documents should have been produced to plaintiffs; however, accepts counsel's assertion that the failure to do so was inadvertent given LSU's disorganized, reactive approach to its commitment to add women's fast pitch softball.

This Court finds that as to the documents regarding the survey of LSU students as to the quality and importance of recreational services [104] and the "New Student Survey" of all LSU students,[105] such documents fall within the plaintiffs' requests for production and should have been produced during discovery.[106] LSU argues the documents were

---

103. The Fifth Circuit has also noted that the degree of specificity and explanation required in the sanction order varies according to "the particular circumstances of a case, including the severity of the violation, the significance of the sanctions, and the effect of the award." *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 883 (5th Cir.1988). Substantial awards for sanctions will be reviewed by the appellate court more rigorously; however, a denial of sanctions will be reviewed using the same analysis. *Id.*

104. These documents are attached to Defendants' Response to Plaintiffs' Motion for Sanctions as Exhibit 6.

105. These documents are attached to Defendants' Response to Plaintiffs' Motion for Sanctions as Exhibit 5.

106. Although the information ultimately might be found to be irrelevant to a fact at issue, the standard for discovery is whether or not the material could be reasonably anticipated to lead to discoverable evidence. Further, as defendants attempted to produce testimony as to these surveys, clearly, defendants felt the information relevant and consequently, should have produced same pursuant to a validly issued discovery request.

not relevant. Again, under discovery, the standard is not relevance, but whether the information reasonably could lead to the discovery of relevant information and this Court finds said documents should have been produced. LSU's counsel also assert they were not aware of the recreational surveys until testimony given during trial. Consequently, LSU argues sanctions are not due. As LSU, itself, elicited testimony as to the existence of this evidence, this Court does not find LSU to have been so foolish as to hide or "rathole" documents within discovery and then attempt to introduce testimony as to their existence at trial. Consequently, this Court accepts that, for whatever reason, LSU's counsel did not become aware of the information until trial. Further, pursuant to objection of plaintiffs, this Court did not allow defendants to introduce the testimony concerning these documents at trial. This Court notes the information within the survey was not relevant to the question at issue and therefore, this Court finds no true prejudice to plaintiffs.

■ This Court finds that although the letter from Beth Pederson to Coach Miriam Hickey dated August 31, 1995 falls within the plaintiffs' requests for production, because it *was written by the plaintiff herself* and *delivered by the plaintiff to LSU* plaintiffs had equal knowledge of same. Therefore, although there might be a technical violation of the discovery provisions, this Court finds no prejudice to the plaintiffs resulted.

■ Finally, as to the March 25, 1993 memo written by Joe Dean regarding the OCR visit to LSU, although failure to produce reflects at best very poor memory on the part of Joe Dean, this memo was provided to plaintiffs by defendants on July 15, 1994. Therefore, it was provided to plaintiffs much earlier than the deadline for the completion of discovery and prior to the Plaintiffs' Second Request for Production of Documents. Further, given the specific questioning of Joe Dean regarding this issue during his deposition on July 14, 1994, LSU asserts plaintiffs had full knowledge of the memo prior to that time. Further, once plaintiffs obtained the documents at Luster's deposition, plaintiffs could have petitioned the Court then to allow redeposition of Dean or whatever relief they felt would have removed any prejudice they felt ensued. This was not done. Further, plaintiffs relied extensively upon the memo at trial. Therefore, again, although there might be technical violation of the discovery provisions, this Court finds no prejudice to plaintiffs resulted.

Therefore, this Court finds the failure of the defendants to comply with the requests for production as to the NCAA documents, the softball plan documents, and the survey documents was a violation of this Court's Scheduling Order and therefore, Federal Rule of Civil Procedure 16(f). Such documents were not produced until during trial, an unacceptable time for production of documents falling within the scope of plaintiffs' requested discovery and clearly beyond the deadline for discovery set forth in the Scheduling Order.

Pursuant to Federal Rule of Civil Procedure 16(f), the Court may sanction a party for failure to obey a scheduling order in a manner which is just and the judge *shall* require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of the non-compliance with this rule, including attorney's fees *unless the non-compliance was substantially justified or such an award would be unjust.*

Defendants' failure to produce the NCAA documents, the softball plan documents, and the survey documents is also a violation of Federal Rule of Civil Procedure 26(e)(2) which requires a party to "seasonably" amend a prior response to a request for production when the party realizes the response was incomplete or incorrect. Rule 26 does not specifically provide for sanctions for a violation of Rule 26(e)(2).[107]

The failure to provide the March 25, 1993 Joe Dean memo is not a violation of either Rule 16(f) or 26(e)(2). The memo was clearly provided prior to the deadline for completion

---

107. This Court realizes that Federal Rule of Civil Procedure 26(g)(3) specifically provides for sanctions, however, that provision for sanctions specifically addresses sanctions for a violation of the certification requirement set out in Rule 26(g).

of discovery contained within the scheduling order. Therefore, there is no violation of Rule 16(f). The memo was provided to plaintiffs in the course of the deposition of Scott Luster which confirmed such a memo existed. It appears from the deposition of Joe Dean taken the day before the deposition of Scott Luster that plaintiffs had very particularized knowledge of the memo at that time. Plaintiffs could have petitioned the Court to redepose Joe Dean as a result of the memo; however, did not do so. Further, there is no violation under Rule 26(e)(2) for failure to update a prior incomplete or incorrect response to discovery if the information is otherwise known to the plaintiffs. Therefore, there is no violation of Rule 26(e)(2).

The failure to provide Pederson's letter to plaintiffs prior to trial is not a violation of either Rule 16(f) or 26(e)(2). The letter was not delivered to Coach Hickey *by plaintiff* until after the deadline for the close of discovery contained in the scheduling order and LSU counsel did not learn about the letter until testimony given at trial. After such testimony, LSU obtained a copy of the letter from Coach Hickey and provided same to plaintiffs. Therefore, LSU complied with the duties set forth in Rule 26(e)(2).

■ The discovery provided by LSU in response to plaintiffs' numerous requests was voluminous; plaintiffs presented massive numbers of exhibits pursuant to the Scheduling Order for possible introduction at trial. LSU's response to plaintiff's motions for sanctions asserts that LSU attempted to respond to all of plaintiffs' discovery requests in good faith and acted with no intent to conceal any documents. LSU also argues no prejudice resulted to plaintiffs. Based upon the conduct of counsel for both plaintiffs and defendants throughout this case and defen-

dants' explanation, this Court does not find the defendants or defendants' attorneys deliberately withheld the requested documents. Instead, this Court finds defendants' failure to produce the requested documents is illustrative of LSU's lack of organization in connection with the administration of women's athletics which permeates this entire case and defense counsel's mistaken reliance upon an incorrect standard for production under discovery. As this Court finds defendants' conduct was not deliberate, this Court finds no violation of Federal Rule of Civil Procedure 26(g)(2), no violation of 28 U.S.C. § 1927, and no basis for levying sanctions under this Court's inherent authority.[108]

Therefore, this Court will consider sanctions only as to defendants' violations of Federal Rule of Civil Procedure 16(f) for failure of the defendants to comply with the Scheduling Order and for defendants' violations of Rule 26(e) for failure to timely supplement production of documents. Because the same underlying conduct forms the basis for the violations of Rules 26(e)(2) and 16(f),[109] this Court will award sanctions under the standard set forth in Rule 16(f) as Rule 26(e)(2) does not set forth specific standards for sanctions.

Defendants' failure to produce the NCAA documents, the softball plan documents, and the survey of students documents were all violations of Federal Rules of Civil Procedure 16(f) and 26(e). However, this Court finds that sanctions should be awarded only for the failure to produce the NCAA documents. As to the NCAA documents, the defendants were aware of these documents, aware of the discovery requests, and should have produced these documents pursuant to the discovery requests. Defendants' decision to substitute their judgment as to the documents' relevance for the standard for discov-

---

**108.** Federal Rule of Civil Procedure 26(g)(2) requires that the signature of an attorney on a discovery response constitutes a certification to the best of the signor's knowledge, information and belief which is formed after reasonable inquiry. This Court finds that such reasonable inquiry was conducted. 28 U.S.C. § 1927 requires a finding that an attorney acted unreasonably and vexatiously. This Court finds that defendants did not act unreasonably or vexatiously. The use of this Court's inherent powers to sanction defendants requires a finding that

the defendants acted with bad faith or with willful disobedience. This Court finds that defendants' violations were not sufficiently deliberate or in bad faith such as to warrant this exceptional action.

**109.** The failure to produce the NCAA documents, the softball plan documents, and the survey documents is the underlying conduct for the violations of both rules.

ery is unacceptable and will be sanctioned by this Court.

However, this Court finds that as to the softball plan documents and the survey documents, no sanctions will be awarded. As to the softball plan documents, this Court has found that the failure to produce these documents was inadvertent and was acknowledged by the defendants. Furthermore, the failure to produce these documents was not prejudicial to the plaintiffs as these documents were presented to the Court and were relied upon by the Court in making a determination *against LSU*. Furthermore this Court recognizes the softball plan documents continued to evolve up through and beyond trial; however, this does not relieve defendants of their obligation to produce same as they evolved. Nonetheless, this Court will not award sanctions for defendants' failure to produce the softball plan documents as such an award would be unjust under the particular facts of this case.

As to the survey documents, this Court has found the defendants were unaware these documents existed and there was no deliberate attempt to conceal these documents as shown by defendants' attempt to introduce testimony concerning them at trial. Furthermore, plaintiffs first learned of these documents during trial and testimony of these documents was not allowed into evidence upon plaintiffs' objection and therefore, had no impact on the amount of trial preparation done by plaintiffs' attorneys. Finally, the survey documents could not have been relevant to the decision made by this Court. Therefore, no sanctions will be awarded based on the failure to produce the survey documents as such an award would be unjust.

Defendants' failure to produce the NCAA documents, however, clearly effected plaintiffs' trial strategy and the amount of work done by the plaintiffs during the course of the trial. This matter was tried to the Court and the Court obtained and considered all the referenced documents and relied upon several when holding LSU to be in violation of Title IX. Consequently, no palpable prejudice resulted to the plaintiffs. This Court cautions that if this had been a jury trial, or if the documents had been of a different nature, this might not have been the result. However, as this Court fully reviewed all documents and relied upon certain of the documents when ruling against LSU, plaintiffs' outcome was not prejudiced. This Court is not unaware, however, of the potential prejudice sustained by plaintiffs by having new and relevant information surface after plaintiffs had planned their trial strategy.

Therefore, based on the violation of Federal Rules of Civil Procedure 16(f) and 26(e) for failure to provide the NCAA documents, this Court GRANTS plaintiffs' Motion for Sanctions pursuant to Rule 16(f). Defendants shall pay the reasonable expenses, including attorney's fees, incurred by the plaintiffs' attorneys directly resulting from defendants' failure to provide the NCAA documents prior to trial.

This Court ORDERS sanctions in an amount equal to the expenses or costs caused by the defendants' violation. However, the plaintiffs' attorneys must establish what costs and expenses, if any, were actually incurred as a result of defendants' actions and that the amount of sanctions requested is reasonable as opposed to self-imposed, mitigatable, or the result of delay in seeking court intervention. Plaintiffs must establish the amount of costs, expenses, and attorney's fees directly resulting from the violation.

Finally, this Court finds as required, that the sanction ordered is the least severe sanction adequate to achieve the purpose of the rule. Attorneys and parties should not be allowed to fall back on an excuse of inadvertence, poor judgment or mistake as to law in order to escape their obligations under discovery.

Plaintiffs have fifteen (15) days to produce documentary evidence of the costs, expenses, and attorney's fees, if any, incurred for only those violations noted by the Court as a basis for sanction. Upon receipt of plaintiffs' documentary evidence, this Court will make its award of sanctions.

## ORDER

Considering the foregoing memorandum ruling;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that William Davis, Joe Dean and the Louisiana Board of Supervisors immediately effectively accommodate LSU's female student population pursuant to Title IX or submit an adequate plan for such compliance as expeditiously as possible within twenty (20) days of receipt of this Order.

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that attorney's fees will be awarded only from May 25, 1995 forward. Plaintiffs are hereby ORDERED to present within twenty (20) days of filing of this Order full documentation and any evidence they feel necessary to establish the amount spent on the *Pineda* claim as limited by this Court's Opinion. Upon receipt, a determination of the amount of attorney's fees to be awarded to the Pinedas and will be made.

This Court GRANTS in part plaintiffs' Motion for Sanctions pursuant to Federal Rule of Civil Procedure 16(f), for defendants' failure to provide the NCAA documents. Defendants shall pay reasonable expenses, including attorney's fees, incurred by plaintiffs' attorneys directly resulting from defendants' failure to provide the NCAA documents prior to trial. Plaintiffs have fifteen (15) days to produce documentary evidence of the costs, expenses, and attorney's fees, if any, incurred for those violations noted by the Court as a basis for the sanctions. Upon receipt, the Court will make its determination of the amount of attorney's fees owed to plaintiffs.